Jeffrey D. Ganz
jganz@riemerlaw.com
Steven E. Fox
sfox@riemerlaw.com
Brett J. Nizzo
bnizzo@riemerlaw.com
RIEMER & BRAUNSTEIN, LLP
Seven Times Square
New York, New York 10036
212-789-3100
*ATTORNEYS FOR 62 MADISON LENDER, LLC AND
NOMAD MEZZ LENDING, LLC*

Hearing Date:  September 26, 2011
Hearing Time:  3:00 p.m.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re                                                                Chapter 11

MADISON HOTEL, LLC,                                  Case No. 11-12560 (MG)

        Debtor.
-----------------------------------------------------------x
In re                                                                Chapter 11

MADISON HOTEL OWNERS, LLC,                   Case No. 11-12334 (MG)

        Debtor.
-----------------------------------------------------------x

## OBJECTION OF 62 MADISON LENDER, LLC AND NOMAD MEZZ LENDING, LLC TO THE DEBTORS' JOINT DISCLOSURE STATEMENT

62 Madison Lender, LLC ("62 Madison") and Nomad Mezz Lending, LLC ("Nomad" and together with 62 Madison, the "Senior Lenders") submit this objection (the "Objection") to the Debtors' Proposed Joint Disclosure Statement (the "Disclosure Statement") filed with this Court on July 31, 2011 [D.R. 21].[1] The Disclosure Statement fails to provide adequate information and, in some cases, any information at all about key components of the Debtors'

---

[1] The Debtors have failed to seek joint administration of their two related bankruptcy cases, but have filed identical Disclosure Statements and Plans. For clarity, the docket references in this Objection will refer only to the docket administered in connection with *In re Madison Hotel, LLC*, Case No. 11-12560 (MG).

1371346.3

proposed Joint Plan of Reorganization (the "Plan") [D.R. 22]. In particular, the Disclosure Statement provides no insight into the Debtors' ability to raise, generate, or pay the $5.7 million to $6.7 million that the Plan proposes to distribute to creditors immediately upon their emergence from bankruptcy. Similarly, the Disclosure Statement provides no explanation of how the Debtors intend to pay the more than $19 million that will be due to 62 Madison on the fifth anniversary of their emergence from bankruptcy. The Debtors have been aware of these flaws in the Disclosure Statement since early August 2011, but they have failed to take any steps to remedy them. Accordingly, the Debtors' request for approval of the Disclosure Statement should be denied.

In support of this Objection, the Senior Lenders make the following statements:

## INTRODUCTION

1.      The Disclosure Statement submitted by the Debtors should not be approved by this Court because it fails to disclose crucial elements of the Plan and does not provide the Debtors' creditors with adequate information necessary to make an informed judgment about the Plan. The Disclosure Statement entirely fails to describe how the Plan will be implemented, and upon close reflection, amounts to nothing more than a request to delay for five years (or longer) the critical question about whether the Debtors have a viable business that can fund operations going forward and also satisfy their secured debt.

2.      Neither the Disclosure Statement nor the accompanying cash flow projections (the "Projections") reveal (a) how the Debtors intend to fund the $5.7 million to $6.7 million in cash obligations that the Plan imposes upon them immediately upon their emergence from bankruptcy, (b) the source by which the Debtors will be able to fund the $19 million balloon

1371346.3

payment to 62 Madison at the end of the proposed five year term or (c) the assumptions about the management of the Hotel and the forecasted growth in occupancy, pricing, and revenue.

3.  The Debtors have had more than ample time to address these issues as they were first raised in the Senior Lenders' Motion to Terminate the Debtors' Exclusive Periods (the "Motion to Terminate Exclusivity"), filed with this Court on August 5, 2011 [D.R. 24], as well as at the subsequent conferences with the Court. Indeed, the Debtors were provided with a specific opportunity to remedy these flaws through the agreed-upon Scheduling Order Regarding Debtors' Proposed Plan of Reorganization (the "Scheduling Order"), as entered by this Court on August 17, 2011 [D.R. 38], which set a deadline of August 25, 2011 for the filing of an amended disclosure statement. The Debtors rejected that opportunity, but still seem set on proceeding with the Plan. In the absence of significantly more disclosure concerning the Debtors' ability to meet the financial obligations imposed upon them by that Plan, however, the Disclosure Statement in its current form should be rejected.

## BACKGROUND

4.  On May 16, 2011, Madison Hotel Owners, LLC (the "Owner") commenced the above-captioned case by filing a voluntary petition for relief before this Court under Chapter 11 of Title 11, United States Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code"). The Owner's only asset is the ownership of 100% of the limited liability company interests ("LLC Interests") in Debtor Madison Hotel, LLC. The Owner is a shell entity created for the sole purpose of owning the LLC Interests, has no other assets, conducts no other business, has no employees, and generates no cash flow.

5.  On May 26, 2011, Madison Hotel, LLC (the "Hotel", and together with the Owner, the "Debtors") commenced its Chapter 11 case by filing a separate voluntary petition for

3

relief before this Court. The Hotel is the owner and operator of a hotel located at 62 Madison Avenue, New York, New York, which is operated under the name "The MAve Hotel." The hotel consists of 72 rooms located on 12 floors.

6. Prior to the commencement of these Chapter 11 cases, the Hotel entered into a loan arrangement with Textron Financial Corporation ("TFC"), which is evidenced by certain documents, instruments, and agreements, including, among other things, the following (together with all documents, instruments, and agreements executed in connection therewith, or related thereto, as well as all subsequent amendments, collectively, the "Mortgage Loan Documents"): (i) Building Loan Agreement dated August 28, 2008, (ii) Building Loan Note dated August 28, 2008, (iii) Building Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of August 28, 2008, which was recorded against the real property located at 62 Madison Avenue, New York, New York – The MAve Hotel (the "Property"), (iv) Project Loan Agreement dated August 28, 2008, (v) Project Loan Note dated August 28, 2008, and (vi) Project Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of August 28, 2008, which was recorded against the Property.

7. The Mortgage Loan Documents provided TFC with a substantial number of reporting requirements and other protections designed to preserve the lender's ability to be repaid in full, including the following items:

> a. <u>Debt Service Coverage Ratio ("DSCR")</u>. Borrower shall deliver, on a quarterly basis starting with the end of the fourth (4th) calendar quarter ending after the Hotel Opening, evidence acceptable to Lender, that the DSCR is at least 1.10 to 1.0 for the twelve month periods ending on the last day of the fourth (4th), fifth (5th), sixth (6th) and seventh (7th) calendar quarters after the Hotel Opening, which DSCR shall increase to 1.20 to 1.0 for the twelve month periods ending on the last day of the eighth (8th), ninth (9th), tenth (10th) and eleventh (11th) calendar quarters after the Hotel Opening, and 1.30 to 1.0 at all times thereafter. (Building Loan Agreement, Section 5.20).

4

b. <u>FF&E Reserve</u>. Borrower is required to maintain and contribute to a FF&E Reserve pursuant to Section 5.12 of the Building Loan Agreement.

c. <u>Financial Statements and Other Reports</u>. Borrower will maintain a system of accounting in accordance with sound business practices to permit preparation of financial statements in conformity with GAAP and proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower with respect to all items of income and expense in connection with the Mortgaged Property. (Building Loan Agreement, Section 5.1).

d. <u>Budgets</u>. Borrower shall prepare and deliver to Lender, no later than thirty (30) days prior to the beginning of each fiscal year of Borrower, forecasts in form and substance reasonably satisfactory to Lender for the following fiscal year, which shall be subject to Lender's review and approval not to be unreasonably withheld. (Building Loan Agreement, Section 5.1(I)).

8. On or about April 5, 2010, TFC transferred and assigned to 62 Madison all of its right, title, and interest in and to the Mortgage Loan Documents. As a result of that transfer, 62 Madison is the holder of a secured claim against the Hotel in the approximate amount of $22,134,392.61 as of the date the Hotel filed its bankruptcy petition.

9. Prior to the commencement of these Chapter 11 cases, the Owner entered into a loan arrangement with the Estate of Lawrence Meinwald, which is evidenced by certain documents, instruments, and agreements, including, among other things, the following (together with all documents, instruments, and agreements executed in connection therewith, or related thereto, as well as all subsequent amendments, collectively, the "<u>Mezzanine Loan Documents</u>"): (i) a Mezzanine Loan Agreement, (ii) a Promissory Note in the original principal amount of $5,000,000, and (iii) a Pledge and Security Agreement. The Mezzanine Loan Documents were subsequently assigned to Nomad. As a result of that transfer, Nomad is the holder of a secured claim against the Owner in the approximate amount of $5,422,685.05 as of the date the Owner filed its bankruptcy petition

5
1371346.3

10. In accordance with the Mezzanine Loan Documents and, in particular, the Pledge and Security Agreement, Nomad had scheduled a secured party's sale of the LLC Interests for 10:00 am on May 17, 2011. Hours prior to the sale, the Owner commenced the above-captioned Chapter 11 case.

## ARGUMENT

11. Section 1125 of the Bankruptcy Code requires a debtor to issue a disclosure statement that contains "adequate information" to allow a "hypothetical investor typical of the holders of claims or interests" of the relevant class to "make an informed judgment about the plan." The subjective determination of what is adequate information is made on a case by case basis and largely within the discretion of the bankruptcy court. *In re Ionosphere Clubs, Inc.*, 179 B.R. 24, 29 (Bankr. S.D.N.Y. 1995).

12. Adequate information has been found to include, *inter alia*, financial information and projections relevant to the decision to accept or reject the plan, the accounting and valuation methods of the financial information provided, the performance of the debtor while in Chapter 11, and the source of the information provided in the disclosure statement. *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991)

13. Approval of a disclosure statement "should be withheld if (1) it is apparent that the plan will not comply with Code § 1129(a) and (2) if it does not contain such information so that all creditors and equity shareholders can make an intelligent and informed decision as to whether to accept or reject the plan." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 980 (Bankr. N.D.N.Y 1988).

14. Furthermore, where a disclosure statement fails to disclose accurately the level of uncertainty pertaining to a crucial condition precedent of the proposed plan, the disclosure

statement will be rejected. *See In re New Haven Radio*, 18 B.R. 977, 979 (Bankr. D. Conn. 1982).

15. The Disclosure Statement must be rejected because it does not provide adequate information and fails to disclose critical components of the Debtors' Plan. Thus, the Debtors' creditors are unable to make an informed decision regarding whether to accept or reject the Plan.

    **A.**   **The Disclosure Statement Fails to Provide Adequate Information Regarding the Source and Availability of the Cash Needed to Fund the Debtors' Financial Obligations Under the Plan.**

16. Section 2.2 of the Plan requires payment in full of Nomad's secured claim in cash on the effective date of the Plan. In accordance with the proof of claim filed by Nomad, that claim was in the amount of $5,422,685.05 on the date the Owner filed its bankruptcy petition.

17. Sections 2.8 and 2.26 of the Plan require the Debtors to pay 25% of all unsecured claims on the effective date of the Plan. According to the Disclosure Statement, the total amount of those claims ranges from $1,113,689 to $5,234,950, depending upon whether the claim of Express Service Forwarding, Inc. is allowed in the full amount of its proof of claim.

18. Based on these three sections of the Plan, the Debtors will be required to pay between $5,701,107.30 and $6,731,422.55 to their creditors on the day they emerge from bankruptcy. The Debtors have nowhere near that level of cash, and the Disclosure Statement fails to provide any information concerning the source of the required funds and the level of risk associated with the Debtors' ability to procure those funds. The lone statement in the Disclosure Statement in support of their purported ability to make these payments is "[t]he Debtors intend to fund the Plan through cash on hand held by the receiver of the Property, operating revenue generated by the operations of the Hotel <u>and by additional amounts to be advanced by Owner and its members</u>." (Disclosure Statement, ¶ 5; emphasis added). There is no further discussion or

details provided in the Disclosure Statement regarding the ability of the Owner and its members to fund the Plan.

19. Rather than disclose or provide any discussion regarding the source or availability of the funds needed to confirm that Plan, the Debtors' simply request that this Court approve the Disclosure Statement based on the mere hope that between $5.7 million and $6.7 million will materialize for the Debtors' benefit between now and the effective date of the Plan.

20. Similarly, the Disclosure Statement fails to provide any information concerning the Hotel's ability to make all of the payments due to 62 Madison under the proposed plan. Specifically, the Plan's proposal to repay 62 Madison's debt over five or ten years will require the Hotel to make a balloon payment at the end of the period in the approximate amount of $19.9 million or $17.1 million, respectively. The Disclosure Statement fails to explain how that will be accomplished, and the Projections do not show that the Debtors will have anywhere close to the required cash on hand to make these balloon payments at the respective times.[2]

**B. The Disclosure Statement Fails to Provide Adequate Information Regarding the Treatment of 62 Madison's Claim.**

21. The Disclosure Statement and Projections are equally inadequate regarding the proposed terms of the restructured debt owed to 62 Madison under the Plan. Paragraph 36 of the Disclosure Statement describes the proposed treatment of 62 Madison's claim against the Hotel as follows:

> "Monthly interest payments on the Allowed Amount of the Claim at an annual interest rate of 5.5% for 60 months, plus monthly amortization payments based upon a 30 year amortization schedule. Outstanding principal amount due at maturity, subject to a 60 month renewal at then prevailing market rates."

---

[2] Indeed, the Projections cover only a five year period and, as a result, fail to show what the Debtors expect their performance to be during the full life of the restructured 62 Madison debt if – as 62 Madison fully suspects – the Hotel opts to extend the term of this debt at the end of the first five-year period.

8

22. Other than basic information concerning the repayment terms (5 year primary term; 5 year extension option; 30 year amortization, annual interest rate of 5.5%), the Disclosure Statement does not provide any insight into the other terms and protections to be provided to 62 Madison during the life of the restructured loan. The Debtors do not suggest that the Mortgage Loan Documents will continue to govern the relationship between the Hotel and 62 Madison. Instead, the Disclosure Statement merely provides that documentation "shall be pursuant to standard recordable forms." (Disclosure Statement, ¶ 36). This appears to leave open the possibility that the Debtors, in violation of the Bankruptcy Code, are attempting to confirm a Plan that will eviscerate the covenants, reporting requirements, default provisions, remedies, and other protections included within the current Mortgage Loan Documents governing the Debtors' relationship with 62 Madison. Absent full disclosure about these critical points, the Disclosure Statement is fatally flawed and cannot be approved.

C. **Other Disclosure Statement Inadequacies**

23. The Disclosure Statement is fatally flawed in other areas. For example, there is absolutely no support or explanation for the Projections, including the projected annual increase in revenue and room rate, and the imminent increase in the occupancy rate at the Property. There is also no disclosure regarding the Debtors' plans for the 2,200 square feet of vacant, unimproved retail space in the lobby of the Property.

24. With respect to the Debtors' plans for the 2,200 square feet of vacant space in the lobby of the Property, the Projections reflect a revenue line item for "Potential Restaurant Rental." Perhaps the Debtors plan to lease the vacant space or operate it as a restaurant. However, the Disclosure Statement contains no discussion about how much it will cost to prepare the space for a restaurant tenant or the basis for the Debtors' expectation that the

restaurant will generate a certain amount of revenue. It is, therefore, impossible for the Debtors' creditors to either evaluate the impact of the vacant space or the "potential restaurant" on the Plan. Moreover, even if it is the Debtors' plan to have a restaurant in the vacant space, the Debtors' creditors have no idea how likely it is that such a restaurant will come to fruition, much less produce the annual projected revenue in excess of $200,000. The disclosure on this point is inadequate.

25. To support the feasibility of the Plan, the Debtors have annexed the Projections as Exhibit "C" to the Disclosure Statement. The Projections purport to contain estimates of what the Hotel will receive in cash receipts on an annual basis through December 31, 2016. The Projections are unreliable because, among other reasons, they do not conform to Generally Accepted Accounting Principles and are not accompanied by any notes or other explanations of the assumptions and historical data upon which they are based.

26. In addition, neither the Disclosure Statement nor the accompanying Projections provide sufficient information concerning the data underlying the Projections, so creditors do not have the ability to determine whether the Projections are achievable. The Debtors' creditors have no insight into what initiatives the Debtors are pursuing and how those initiatives will translate into the projected revenue figures. Specifically, the Projections anticipate the Debtors' increasing revenue from 2012 to 2016, but fail to state upon what assumptions these increases are based.

27. The Debtors' disclosures with respect to the projected annual increases in room rate and the imminent increase in occupancy rate are likewise inadequate. Simply put, the Debtors offer no rationale for how they will achieve the results set forth in the Projections. The

Debtors' creditors should not be forced to adopt the Projections blindly, and the Court should require additional disclosures in support of the Projections.

28. Similar failings exist with respect to the assumptions relating to the expense side of the Projections. Moreover, the Projections annexed to the Disclosure Statement indicate that they are "for discussion purposes only," creating further doubt as to their accuracy and sustainability under scrutiny.

29. The Projections also fail to provide information on a monthly or even quarterly basis to allow creditors to sensitize the projections for seasonality and similarly based factors.

30. In the absence of any of this information, the Debtors' creditors have no ability to determine whether the income and expense figures included in the Projections are in line with, or vastly different from, the Debtors' historical or more recent experience.

31. By failing to identify the source or availability of funding so critical to confirmation of the Plan, the Disclosure Statement is woefully deficient and ineffective, and the Plan at this juncture must be viewed as nothing more than illusory. Under the current circumstances, the Debtors' creditors simply are not armed with the information needed to make an intelligent and informed decision regarding whether to accept or reject the Plan.

### D. The Disclosure Statement Inadequately Describes the Proposed Release of the Debtors' Insiders.

32. A third party release in a plan of reorganization should not be approved absent a finding that truly unusual circumstances render the release terms important to success of the plan. *Metromedia Fiber Network, Inc.*, 416 F.3d 136, 143 (2d Cir. 2005). The United States Court of Appeals for the Second Circuit has declined to develop a rigid multi-factored test, but has noted that non-debtor releases have been approved when: (a) the estate receives substantial consideration; (b) the enjoined claims are channeled to a settlement fund rather than

extinguished; (c) the enjoined claims would directly impact the debtor's reorganization by way of indemnity or contribution; and (d) the plan otherwise provided for full payment of the enjoined claims. *Id.* at 142. Notwithstanding the foregoing factors, no case has tolerated non-debtor releases absent the finding of circumstances that may be characterized as unique. *Id.*

33. At Paragraph 11.2 of the Disclosure Statement, the Debtors, rather ambiguously, propose broad and sweeping third party releases in favor of the Debtors, their members, and their principals including, among others, the Owner's managing members, Debtors' insiders – BenZion Suky ("Suky") and Joseph Ben Moha ("Moha").

34. Suky and Moha have each executed personal guaranties of the amounts due to 62 Madison, but the Disclosure Statement does not state clearly whether it is the intention of the Plan that Suky and Moha be released from those obligations. Moreover, if it is the Plan's goal to obtain the release of Suky and Moha from their obligations to 62 Madison, the Disclosure Statement utterly fails to disclose any grounds to support the granting of such releases.

35. Absent more disclosure as to the nature of the releases and the extent of the contributions to be made in exchange for the releases, the Disclosure Statement should not be approved.

1371346.3

# CONCLUSION

WHEREFORE, for the foregoing reasons, the Senior Lenders respectfully request that this Court (i) deny approval of the proposed Disclosure Statement; and (ii) grant such further relief as the Court deems just and proper.

Dated: September 20, 2011
      New York, New York

    Respectfully submitted,

    RIEMER & BRAUNSTEIN LLP
    *Counsel to 62 Madison Lender, LLC and*
    *Nomad Mezz Lending, LLC*

    By: */s/ Jeffrey D. Ganz*
        Jeffrey D. Ganz
        Steven E. Fox
        Brett J. Nizzo
        Times Square Tower
        Seven Times Square, Suite 206
        New York, New York 10036
        Tel.: (212) 789-3100