RIEMER & BRAUNSTEIN LLP
Barry G. Braunstein, Esq.
Jeffrey D. Ganz, Esq.
Steven E. Fox, Esq.
Times Square Tower
Seven Times Square, Suite 2506
New York, New York 10036
Tel.: (212) 789-3100

*Attorneys for Plan Proponent 62 Madison Lender, LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
In re

MADISON HOTEL, LLC,

                Debtor.

---------------------------------------------------------x

Chapter 11
Case No.  11-12560 (MG)

### DECLARATION OF DAVID J. STEINBERG IN SUPPORT OF CONFIRMATION OF THE SECOND MODIFIED THIRD AMENDED PLAN OF REORGANIZATION FOR MADISON HOTEL, LLC PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE

**DAVID J. STEINBERG,** makes this declaration pursuant to 28 U.S.C. § 1746, and states:

1.      I am a managing director of Madison Capital LLC, with responsibility over the acquisitions team.  I am also an Authorized Person of 62 Madison Loan Holdings LLC, the Manager of 62 Madison Lender LLC ("62 Madison").  I received a bachelor's degree from Tufts University in 1998, and a *juris doctor* from the University of Miami in 2001.

2.      I submit this Declaration in support of confirmation of the *Second Modified Third Amended Plan of Reorganization for Madison Hotel, LLC*, dated November 9, 2012 [D.R. No. 137] (as amended, modified or supplemented from time to time, the "Plan").[1] I am familiar with the terms and provisions of the Plan, the Disclosure Statement and with the documents comprising the Plan Supplement. Together with the 62 Madison's legal advisors, I have reviewed the requirements for confirmation of the Plan pursuant to, inter alia, section 1129 of the Bankruptcy Code.

3.      Unless otherwise stated herein, the facts set forth in this declaration are based upon (i) my personal knowledge or the personal knowledge of employees of the Plan Proponent who report to me, (ii)

---

[1]     Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Plan or the *Memorandum of Law in Support of Confirmation of the Second Modified Third Amended Plan of Reorganization for Madison Hotel, LLC Pursuant to Chapter 11 of the Bankruptcy Code* (the "Confirmation Brief"), filed contemporaneously herewith.

reasonable inquiry, (iii) review by me or those who report to me of records maintained by the Plan Proponent and/or that are a matter of public record and have been filed in the Bankruptcy Court in the Debtor's Chapter 11 Case, or (iv) my opinion based upon my familiarity with the Debtor's business, operations and financial condition. If I were called upon to testify, I could and would testify competently as to the facts set forth herein.

## A.    Overview of Chapter 11 Case

4.    Debtor Madison Hotel, LLC is the owner and operator of a boutique hotel located at 62 Madison Avenue, New York, NY, which is operated under the name "The MAve Hotel." The hotel consists of 72 rooms located on 12 floors.

5.    100% of the limited liability company interests ("LLC Interests") in the Debtor are owned by Madison Hotel Owners, LLC ("Owners"), a shell entity created for the sole purpose of owning the LLC Interests. On May 16, 2011 Owners filed its own separate petition for relief under Chapter 11 of the Bankruptcy Code. As of the date hereof, the Owners Chapter 11 case is still pending. This Plan does not propose to treat the claims or equity interests in the Owners Chapter 11 case.

6.    According to various statements and reports filed with the Bankruptcy Court by the Debtor, the Debtor contends that its financial problems arose from the general economic downturn which in turn caused the Hotel Property's income to drop, which in turn, impaired the hotel's cash flow. The Plan Proponent instead believes that the Debtor commenced this Chapter 11 case as a means to avoid and forestall the Plan Proponent's efforts to foreclose on the Debtor's interests in the Hotel Property (and the LLC Interests held by Owners) following the Debtor's substantial, material and continuing defaults under its pre-bankruptcy loan arrangements with the Plan Proponent (described in Sections D and E below).

### i.    Debtor's Chapter 11 Filing

7.    On May 26, 2011 (the "Petition Date"), the Debtor filed its petition for relief under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court. Under the provisions of the Bankruptcy Code, the Debtor is continuing to operate its business as Debtor in possession, subject to the supervision of the Bankruptcy Court and the U.S. Trustee.

### ii.    Committee Formation

8.    As of the date of this Declaration, the U.S. Trustee has not formed an official creditors' committee in the Chapter 11 case.

### iii.    Pre-Petition Credit Facility

9.    On or about August 28, 2008, Textron Financial Corporation ("Textron"), entered into that certain building loan agreement and that certain project loan agreement (collectively, "Senior Loan Documents") with Debtor Madison Hotel LLC, pursuant to which Textron provided a senior loan in the original aggregate principal amount of $30,000,000 (the "Senior Loan"). The Senior Loan is secured by,

among other things, mortgages on the real property located at 62 Madison Avenue, New York, New York (collectively, the "Mortgage"). As noted above, the aforementioned property is owned and operated by the Debtor as a boutique hotel under the name "The MAve Hotel."

10.     On or about August 28, 2009, in connection with the Loan, "in order to induce Lender to enter into the Loan Agreement," Owners, 62 Madison Partners LLC, Joseph Ben Moha and Benzion Suky (the "Guarantors") each executed and delivered to Textron a Guaranty Agreement (the "Guaranty"), as amended by the Amendment to Guaranty executed by the Guarantors and Textron on or about February 11, 2009 (the "Amended Guaranty"). Pursuant to the Guaranty, the Guarantors absolutely and unconditionally, jointly and severally, inter alia, guaranteed the full, prompt, complete and faithful performance, payment, observance and fulfillment by the Debtor of all Obligations, including, but not limited to, the payment of all principal of and interest on the Loan and all fees, costs and expenses of said borrower owing to Textron (now the Plan Proponent) under the Senior Loan Documents.

11.     On or about April 5, 2010, Textron assigned and transferred to the Plan Proponent all of its rights, title and interests under, among other things, the Senior Loan.

### iv.    The Mezzanine Loan

12.     On or about August 28, 2008, the Estate of Lawrence Meinwald (the "Meinwald Estate") entered into a certain Mezzanine Loan Agreement with Owners (the "Mezzanine Borrower"), pursuant to which the Meinwald Estate provided the Mezzanine Borrower with a mezzanine loan in the original aggregate principal amount of $5,000,000 (the "Mezzanine Loan"). The Mezzanine Loan is secured by, among other things, a pledge and security agreement dated as of August 28, 2008 (the "Pledge Agreement"), pursuant to which the Meinwald Estate was granted a first priority security interest in all of Mezzanine Borrower's ownership interest in the Debtor. The Loan Arrangement is evidenced by, among other things, (i) a Mezzanine Loan Agreement, (ii) a Promissory Note, and (iii) a Pledge Agreement.

13.     On or about December 10, 2008, the Meinwald Estate assigned and transferred to defendant Carolyn T. Meinwald all of its rights and interests under the Mezzanine Loan. Thereafter, on or about February 15, 2011 Carolyn T. Meinwald sold and assigned all of her rights, title and interests under, among other things, the Mezzanine Loan to Nomad Mezz Lending, LLC ("Nomad"). As a result, Nomad is the only secured creditor of Owners, and holds the single largest claim against the Owners estate. Nomad is an affiliate of the Plan Proponent here.

### v.    Pre-Petition Litigation; Senior Loan Foreclosure Action

14.     By letter dated November 11, 2009, Textron informed the Debtor and Owners that because of its failure to make certain required monthly payments or principal and/or interest due on October 1, 2009 and November 1, 2009, one or more Events of Default had occurred under the Senior Loan, and as a result, Textron reserved the right to declare all obligations under the Senior Loan

immediately due and payable in full. Not having received payment, by letter dated November 17, 2009, sent to the Debtor, Textron accelerated the Senior Loan and demanded payment of all obligations under the Senior Loan (the "Demand for Payment").

15.     On February 16, 2010, Textron, as the original plaintiff and the party which originated the Senior Loan, filed a Summons and Complaint in the Supreme Court for the State of New York, New York County (the "State Court" and the "State Court Action", respectively), seeking to (a) foreclose on the mortgages securing the Senior Loan and (b) obtain payment from various Guarantors under their respective guarantees that were executed and delivered as part of the Senior Loan. That same day, Textron also filed a Notice of Pendency of Action in the New York County Clerk's office. By Order dated February 17, 2010, the Court granted Textron's application for the appointment of a temporary receiver, and appointed Margaret H. Mayo as receiver (the "Receiver"). In accordance with the provisions of Section 543(d)(1) of the Bankruptcy Code, the Receiver continues to possess, manage and control, inter alia, the Hotel Property.

### vi.    The Mezzanine Loan UCC Sale

16.     As of the Petition Date, the Mezzanine Loan was in default, with Owners owing Nomad $5,000,000, plus interest, costs, expenses, and costs of collection (including attorneys' fees). In accordance with the Mezzanine Loan and, in particular, the Pledge and Security Agreement, Nomad had scheduled a secured party's sale of 100% of the LLC Interests for 10:00 a.m. on May 17, 2011. Mere hours prior to the sale, Owners filed a voluntary petition with the Bankruptcy Court in order to forestall the scheduled UCC sale. The Debtor filed this Chapter 11 Case shortly thereafter to forestall 62 Madison's foreclosure efforts.

### B.    Events Subsequent to Chapter 11 Filing

### i.    Cash Collateral Order

17.     Following the Petition Date, the Debtor and the Receiver continued to require use of the Hotel Property's cash and cash equivalents to continue day-to-day operations of the hotel; however, all of such cash and cash equivalents constituted the Plan Proponent's "cash collateral", on account of which use it was entitled to receive certain "adequate protection" in accordance with Sections 363 and 361 of the Bankruptcy Code. Accordingly, pursuant to a Stipulation approved by the Bankruptcy Court on August 17, 2011 [D.R. No. 36] ("Cash Collateral Stipulation"), among other things, the parties agreed that (a) the Receiver would continue to manage the day-to-day affairs of the Hotel Property, (b) the Debtor and the Receiver could continue to use the Plan Proponent's cash collateral in accordance with the terms of the Cash Collateral Stipulation, and (c) the Plan Proponent was to receive certain adequate protection, including periodic cash payments, in accordance with the terms of the Cash Collateral Stipulation. Subsequent to the filing of the Plan, the Receiver informed 62 Madison that available Hotel

Cash on Hand had declined to a level that the Receiver determined was insufficient to continue making the required adequate protection payments to 62 Madison under the Cash collateral Stipulation. As of the date of this Declaration, the Receiver has failed to make the required adequate protection payments for February and March 2013. 62 Madison has reserved all rights in this regard.

## ii.  **The Debtor's Proposed Amended Plan**

18.     At the outset of this Chapter 11 Case, the Debtor initially advised the Bankruptcy Court that it had intentions of selling the Hotel Property and paying off the Senior Loan in full from the sale proceeds, and reinstating the Mezzanine Loan obligations with a view toward payment in full there as well.

19.     On July 31, 2011, the Debtor filed its initial proposed Joint Plan of Reorganization (together with Owners as a co-proponent) [D.R. No. 22] and related proposed Joint Disclosure Statement [D.R. No. 21]. Under that initial plan, the Debtor and Owners proposed that the Senior Loan would be paid in full over five (5) years, with interest accruing at 5.5%, and the Mezzanine Loan would be paid in full in cash on the effective date of the plan. The Debtor and Owners further proposed that holders of unsecured claims would be paid in limited installments as follows: 25% on the effective date; 25% on the 6 month anniversary of the effective date; 25% on the 1 year anniversary of the effective date; and 25% on the 18 month anniversary of the effective date.  The holders of the equity interests in the Debtor (i.e., Owners) would continue to retain their respective ownership interests unimpaired. The Debtor and Owners later acknowledged that they did not have the independent resources available to make the distributions and other payments required under their initial plan, and thereafter abandoned any further efforts to seek confirmation of that plan.

20.     On October 19, 2011, the Debtor and Owners filed an amended proposed Joint Plan of Reorganization [D.R. No. 47] and related amended proposed Joint Disclosure Statement [D.R. No. 48]. Under their amended plan, the Debtor and Owners contemplated that a portion (i.e., 50%) of the ownership interests in the reorganized debtor would be issued to an entity known as CRP Holding SPA (or to a designee or affiliate thereof) in exchange for its commitment to provide the funding necessary to make the distributions and other payments required under the amended plan, with the remaining 50% of the ownership interests in the reorganized debtor to be retained by the existing equity holders. This amended plan also reiterated the Debtor's and Owners' intention that the Senior Loan would be impaired and paid in full over five (5) years, with interest; the Mezzanine Loan would be paid in full in cash on the effective date; and unsecured creditors would continue to be paid in installments stretching over an 18 month period from the effective date.

21.     Subsequent to the Debtor's and Owners' filing of their amended plan, the Plan Proponent entered into intensive negotiations with representatives of CRP Holding SPA and others concerning the

terms of the amended plan, including, but not limited to, the treatment to be accorded the Senior Loan and Mezzanine Loan thereunder. Despite these efforts, the parties were unable to reach an agreement on the terms of a consensual plan. The Debtor and Owners later acknowledged that their amended plan could not succeed, and thereafter abandoned any further efforts to seek confirmation of that amended plan.

### iii.    Plan Proponent's Plan

22.    As a result of the parties' failure to reach a negotiated agreement concerning consensual plan terms, the Plan Proponent has formulated the Plan as a means to bring this Chapter 11 Case to an orderly, and final, resolution and conclusion.

23.    Toward that end, on November 9, 2012 the Plan Proponent filed its (i) [Proposed] Second Modified Third Amended Plan of Reorganization for Madison Hotel, LLC, dated November 9, 2012 [D.R. No. 137] (defined above as the "Plan"), and (ii) [Proposed] Second Modified Third Amended Disclosure Statement [D.R. No. 138] (the "Disclosure Statement").

24.    Pursuant to that certain "Order (A) Approving [Proposed] Second Modified Third Amended Disclosure Statement; (B) Establishing Treatment Of Claims For Notice And Voting Purposes; (C) Establishing Deadline And Procedures For Temporary Allowance Of Claims For Voting Purposes; (D) Approving Solicitation Package And Procedures For Distribution; (E) Approving Form Of Ballot; (F) Establishing Voting Deadline And Procedures For Tabulation Of Votes; (G) Scheduling Hearing To Consider Confirmation Of Plan; (H) Approving Form And Manner Of Notice Of Confirmation Hearing And Procedures For Filing Objections To Confirmation; And (I) Granting Related Relief" [D.R. No. 175] ("DS Approval Order"), the Court, inter alia, approved the Disclosure Statement, fixed certain notice and balloting procedures, and set a confirmation hearing with regard to the Plan and associated objection deadlines.

### C.    Significant Features of the Plan

### i.    Overview

25.    The fundamental premise underlying the Plan is grounded in the determination by the Plan Proponent that maximum recoverable value, and the creation of the funds required to make the Distributions provided for under the Plan at the earliest possible time, can best be achieved for the benefit of holders of Allowed Claims (and where applicable, Equity Interests) through a prompt and orderly implementation of a marketing process by which the Hotel Property is sold after reasonable exposure to the marketplace, with the net proceeds realized upon the consummation of any such sale being distributed in accordance with the terms of this Plan.

26.    The Confirmation Order shall provide that upon the occurrence of the Effective Date, the Liquidating Trustee shall be vested with all requisite rights and powers to exercise possession and control, including right of determination, over (a) all of the Debtor's rights, title and interests in and to the Hotel Property, including all improvements, appurtenances and personal property associated therewith, and (b)

Hotel Cash on Hand (to the extent not utilized in making Distributions as provided for in this Plan) for administration by the Liquidating Trustee, as the duly authorized representative of the Liquidation Trust. In addition, on the Effective Date all of the Debtor's rights, title and interests in and to any and all Causes of Action and Avoidance Actions shall be transferred to the Liquidation Trust for administration by the Liquidating Trustee. Upon the occurrence of the Effective Date, (a) the Receiver's authority to manage, control and possess the Debtor's property, including the Hotel Property, under Section 343(d)(1) of the Bankruptcy Code shall be deemed revoked; (b) the Receiver's authority to use "cash collateral" shall be deemed terminated; and (c) the Liquidating Trustee shall be deemed to have replaced and supplanted the Receiver, and thereupon shall take control of the Hotel Property and be responsible for the management and operation thereof until the Liquidating Trustee consummates a sale or other disposition of the Hotel Property in accordance with the terms of this Plan. On the Effective Date, the Liquidating Trustee shall establish a reserve from Hotel Cash on Hand in the amount of $275,000 in respect of the Receiver's projected outstanding fees and expenses through the Effective Date. The Liquidating Trustee shall pay the Receiver from such reserve an amount equal to the amount awarded by the State Court upon the State Court's discharge of the Receiver from any further duties.

27.    The documents governing the establishment and governance of the Liquidation Trust shall provide that the Liquidating Trustee, on behalf of the Liquidation Trust, shall be obligated to consult with the Plan Proponent as to all material decisions and actions, including, without limitation, with regard to the sale or other disposition of the Hotel Property. The documents governing the establishment and governance of the Liquidation Trust shall also provide that (a) the Liquidating Trustee, on behalf of the Liquidation Trust, shall engage the Hotel Broker to market the Hotel Property for sale or other disposition to the highest and/or best bidder, with such engagement to be pursuant to and in accordance with the terms of the Hotel Broker Engagement Agreement, and further with such sale to be free and clear of any and all liens, claims and encumbrances of whatever kind and/or nature (with any such liens, claims and encumbrances to attach to the proceeds of sale and thereupon be dealt with as provided in this Plan), (b) until such time as the Hotel Property is sold to the highest and/or best bidder for the Hotel Property following implementation of the Hotel Property Sale Procedures, the Liquidating Trustee shall provide periodic progress reports (as to the progress being made in connection with the sale of the Hotel Property) to holders of Allowed Claims that make a written request to the Liquidating Trustee therefor, and (c) following the payment in full of the Allowed Class 1 Secured Claim (if at all), the holders of Allowed Class 3 Claims shall be entitled to designate a replacement person and/or entity to undertake and assume the role of "Liquidating Trustee" to administer the Liquidating Trust from that point forward.

28.    The Hotel Broker, working in conjunction and in cooperation with the Liquidating Trustee, shall implement the Hotel Property Sale Procedures in connection with the solicitation of bids for

the Hotel Property and the conduct of any competitive bid auction in connection therewith. Subject to prior consultation with the Hotel Broker and the Plan Proponent, the timing of the marketing/sale process is described below:

| Event | Timing |
|-------|--------|
| Marketing Activities | Commences on the Effective Date and concludes 30 days after the Effective Date |
| Bid Solicitation and Review | Commences upon the conclusion of the marketing period and concludes 15 days thereafter |
| Competitive Bid Auction | To be held on the first Business Day on or after the 46th day after the Effective Date |
| Bankruptcy Court Approval Hearing | At the election of the Liquidating Trustee, 10 days after the Auction (subject to the Bankruptcy Court's availability) |

29.    In addition, on the Effective Date the Liquidating Trustee shall enter into a Purchase and Sale Agreement with the holder of the Allowed Class 1 Secured Claim (or its designee) under which the holder of the Allowed Class 1 Secured Claim (or such designee) agrees to serve as a "stalking horse" buyer of the Hotel Property for an aggregate purchase price of $23,000,000 (payable in the form of a credit bid of a portion of the Class 1 Secured Claim in such amount) (defined in the Plan as the "Stalking Horse Agreement"), subject to the Liquidating Trustee's solicitation of higher and/or better offers consistent with the Hotel Property Sale Procedures. The form of the Stalking Horse Agreement is annexed to the Plan as Exhibit "D". The Plan further contemplates that the upon its determination of the highest and/or best offer for the Hotel Property following implementation of the Hotel Property Sale Procedures, the Liquidating Trustee shall seek Bankruptcy Court approval of any sale or other disposition of the Hotel Property by the Liquidation Trust. In accordance with Article XI of the Plan, the Bankruptcy Court will retain jurisdiction to hear and determine any motion seeking approval of any sale of the Hotel Property by the Liquidation Trust and/or Liquidating Trustee.

30.    Any fees, costs, or expenses incurred by the Liquidating Trustee in connection with the marketing and sale of the Hotel Property, including any fees and/or commissions earned by the Liquidating Trustee and/or the Hotel Broker, and/or expenses incurred in implementing the Hotel Property Sale Procedures, shall be paid from the net proceeds realized upon a sale of the Hotel Property.

31.    In addition, on the Effective Date, any right, claim or cause of action, belonging to the Debtor or its estate against any Person or Entity, including, without limitation, any claim to avoid a transfer under, inter alia, Sections 544, 547, 548, 549 or 553(b) of the Bankruptcy Code, shall be transferred, conveyed and assigned by the Debtor to the Liquidation Trust for the ratable benefit of the

holders of Allowed Claims and Equity Interests in the order of their respective statutory priorities as set forth in the Bankruptcy Code and as provided for in the Plan. The Liquidating Trustee, on behalf of the Liquidation Trust, shall pursue, settle or release all reserved rights of action, as appropriate, in accordance with the best interest of and for the benefit of the creditors entitled to receive Distributions under the Plan.

### ii.    Unclassified Claims under the Plan

32.    Administrative Claims and Priority Tax Claims are not classified in the Plan. As noted above, the Receiver recently determined that available Hotel Cash on Hand is insufficient to make the required adequate protection payments under the Cash Collateral Stipulation. As a result, and in the event that the aggregate of Hotel Cash on Hand and Hotel Property Sale Proceeds is not sufficient to pay Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and the Class 1 Secured Claim in full in accordance with the Plan, the Plan Proponent shall contribute such supplemental Cash as may be required to pay Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims in accordance with the Plan.

33.    The Plan provides for the following proposed treatment of Allowed Administrative Claims and Allowed Priority Tax Claims:

a)    **Administrative Claims**.  Except to the extent the holder of an Allowed Administrative Claim agrees otherwise, each holder of an Allowed Administrative Claim shall be paid the full amount thereof from Hotel Cash on Hand, in Cash and without interest, as soon as practicable after the later of (i) the Effective Date, (ii) the date on which such Administrative Claim becomes an Allowed Administrative Claim.

b)    **Priority Tax Claims**.  Allowed Priority Tax Claims shall be paid, at the election of the Plan Proponent, in full, in Cash from Hotel Cash on Hand, either (x) on the Effective Date, or (y) in equal annual installments payable over the period that is five (5) years from the Petition Date, except to the extent the holder of an Allowed Priority Tax Claim agrees otherwise. Upon the consummation of a sale of the Hotel Property by the Liquidating Trustee in accordance with the terms of the Plan, any remaining unpaid installments in respect of an Allowed Priority Tax Claim shall be deemed accelerated and shall be paid from net distributable Hotel Property Sale Proceeds. Until paid, such Priority Tax Claims shall accrue statutory interest from the Effective Date, fixed at the applicable federal or state statutory rate as in effect with respect to such claim on the Effective Date.

### iii.    Classified Claims and Equity Interests Under the Plan

34.    The Plan provides for four (4) separate Classes of "impaired" Claims and Equity Interests. The Plan provides for the following treatment of each such Class:

a)    <u>**Class 1 – 62 Madison Lender, LLC Secured Claim**</u>

35.    As of the Petition Date, the amount of the Class 1 Secured Claim of 62 Madison was $22,134,392.61, and as of August 23, 2012, was $23,549,732.45. For purposes of the Plan, the Class 1 Secured Claim is deemed to be an Allowed Secured Claim in the amount of $23,549,732.45.

36.    The Plan provides that the holder of the Allowed Class 1 Secured Claim shall receive, until the full Allowed Amount of its Class 1 Secured Claim is paid in full:

i.    All of the net distributable Hotel Property Sale Proceeds and, to the extent necessary and available, Hotel Cash on Hand, after deduction of any amounts necessary to pay in full any remaining Allowed Priority Tax Claims, Allowed Priority Claims, and any amounts due the Receiver.

ii.    The Liquidating Trustee shall make payment of the net distributable Hotel Property Sale Proceeds to the holder of the Class 1 Secured Claim not later than one (1) Business Day after the closing of a sale of the Hotel Property.

iii.    In addition, on the first Business Day of each calendar month after the Effective Date (or any pro rata portion thereof) and continuing until the consummation of a sale of the Hotel Property by the Liquidating Trustee in accordance with the Plan, and solely to the extent the Liquidating Trustee determines, in his discretion and following consultation with the Plan Proponent, that there is sufficient available Hotel Cash on Hand to make payments to the Holder of the Class 1 Secured Claim in an amount consistent with the Cash Collateral Stipulation, the Liquidation Trust shall pay to the holder of the Allowed Class 1 Secured Claim from Hotel Cash on Hand the monthly sum of $164,322.96 in respect of post-confirmation accrued and accruing interest on account of the Class 1 Secured Claim.

iv.    In the event the net distributable Hotel Property Sale Proceeds and, the extent necessary and available the Hotel Cash on Hand,  after deduction of any amounts necessary to pay in full any remaining Allowed Priority Tax Claims, Allowed Priority Claims, and any amounts due the Receiver are insufficient to pay the holder of the Allowed Class 1 Secured Claim the full amount thereof, then the holder of the Allowed Class 1 Secured Claim shall have an Allowed Class 3 General Unsecured Claim equal in a dollar amount to the amount of any such deficiency, and be entitled to receive, in addition to any other amounts payable to it in respect of its Allowed Secured Claim, its Pro Rata Share (calculated based on the then dollar amount of any deficiency claim plus the Allowed Amount of all other Allowed Class 3 Claims) of net distributable proceeds realized by the Liquidating Trustee from the prosecution and/or settlement of any Causes of Action and/or Avoidance Actions.

v.        In accordance with Section 1129 of the Bankruptcy Code, the holder of the Allowed Class 1 Secured Claim shall retain its lien and security interests in and upon the Hotel Property and all of the Debtor's cash and other assets until such property is sold.

vi.        In accordance with Sections 363(k) and 1129 of the Bankruptcy Code, the holder of the Allowed Class 1 Secured Claim shall retain its right to credit bid the full amount of its Allowed Secured Claim in connection with any such Hotel Property sale transaction.

vii.        Additionally, until such time as amounts due in respect of the Senior Loan are paid in full, the holder of the Allowed Class 1 Secured Claim shall retain any and all rights and remedies that it may have as against any third party, including, without limitation, any guarantors, with respect to the amounts due in respect of the Senior Loan.

viii.        As also noted above, in the event that the aggregate of Hotel Cash on Hand and Hotel Property Sale Proceeds is not sufficient to pay Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and the Class 1 Secured Claim in full in accordance with the Plan, the Plan Proponent shall contribute such supplemental Cash as may be required to pay Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims in accordance with the Plan.

b)        **Class 2 - Priority Claims**.

37.        The Plan provides that Allowed Priority Claims shall be paid, at the election of the Plan Proponent, in full, in Cash from Hotel Cash on Hand, either (x) on the Effective Date, or (y) in equal annual installments payable over the period that is five (5) years from the Effective Date, except to the extent the holder of an Allowed Priority Claim agrees otherwise. Upon a consummation of a sale of the Hotel Property by the Liquidating Trustee in accordance with the terms of this Plan, any remaining unpaid installments in respect of an Allowed Priority Claim shall be deemed accelerated and shall be paid from net distributable Hotel Property Sale Proceeds. Until paid, and provided that there are available funds to make such payment, such Priority Claims shall accrue simple interest on the remaining unpaid balance thereof from the Effective Date until the date such claim is paid in full at the rate of 4.5%.

c)        **Class 3 - General Unsecured Claims**.

38.        The Plan provides that each holder of an Allowed Class 4 Claim shall receive in full, complete and final satisfaction of each such Allowed Class 4 Claim, until paid in full (inclusive of simple interest on the remaining unpaid balance thereof from the Effective Date until the date each such Claim is paid the full Allowed Amount thereof at the rate of 4.5%, provided that there are available funds to make such interest payment):

(a)    its Pro Rata Share of net distributable Hotel Property Sale Proceeds <u>after</u> the payment in full of the Allowed Class 1 Secured Claim, any residual Allowed Priority Tax Claims, and any residual Allowed Priority Tax Claims, <u>plus</u>

(b)    its Pro Rata Share of net distributable proceeds realized by the Liquidating Trustee from the prosecution and/or settlement of any Causes of Action and/or Avoidance Actions.

**d)    Class 4 - Equity Interests.**

39.    The Plan provides that all Class 4 Equity Interests shall be cancelled upon the occurrence of the Effective Date. Each holder of a Class 4 Equity Interest shall receive in full, complete and final satisfaction of each such Allowed Class 4 Equity Interest its Pro Rata Share of remaining net distributable proceeds, if any, realized by the Liquidation Trust after the payment in full of all Administrative Claims, Priority Tax Claims, the Class 1 Secured Claim, Class 2 Priority Claims, and Class 3 General Unsecured Claims.

**D.    The Plan Satisfies Section 1129 of the Bankruptcy Code**

40.    Based on my understanding of the Plan, the events that have occurred throughout the Debtor's Chapter 11 Case, and discussions I have had with the Plan Proponent's professional advisors regarding the Chapter 11 Case and the requirements of the Bankruptcy Code, the Plan satisfies all of the applicable requirements of section 1129(a) of the Bankruptcy Code.

**a)    Plan Compliance with 11 U.S.C. § 1129(a)(1)**

41.    The Plan complies with section 1129(a)(1) of the Bankruptcy Code as follows:

• **Section 1122 of the Bankruptcy Code**: Article IV of the Plan provides for the separate classification of Claims against, and Equity Interests in, the Debtor based upon differences in the legal nature and/or priority of such Claims and Equity Interests. Each class contains only Claims or Equity Interests that are substantially similar to each other.

• **Section 1123(a)(1) of the Bankruptcy Code**: The Plan designates four (4) different Classes of Claims and Equity Interests, subject to section 1122 of the Bankruptcy Code, *see* Plan Articles IV, V and VI, other than Administrative Claims and Priority Tax Claims.

• **Section 1123(a)(2) of the Bankruptcy Code**: Pursuant to Articles V and VI of the Plan, there are no unimpaired classes of claims under the Plan. *See* Plan Arts. V and VI.

• **Section 1123(a)(3) of the Bankruptcy Code**: The treatment of each Claim or Equity Interest in those Classes designated under the Plan as impaired is set forth in Articles IV, V and VI of the Plan.

• **Section 1123(a)(4) of the Bankruptcy Code**: The Plan provides that the treatment of each Claim against or Equity Interest in the Debtor in each respective Class is the same as the

12

treatment of every other Claim or Equity Interest in such Class, unless the holder of a particular Claim or Equity Interest has agreed to a less favorable treatment for such Claim or Equity Interest.

- Section 1123(a)(5) of the Bankruptcy Code: The Plan and the various documents and agreements set forth in the Plan Supplement provide adequate and proper means for the implementation of the Plan. As set forth in the Disclosure Statement and the Plan, the Plan Proponent has determined that maximum recoverable value, and the creation of the funds required to make the Distributions provided for under the Plan at the earliest possible time, can best be achieved for the benefit of holders of Allowed Claims (and where applicable, Equity Interests) through (a) the transfer on the Effective Date of all of the Debtor's Hotel Cash on Hand and other assets and interests to the Liquidation Trust, guided by a liquidating trustee, and (b) the sale or other disposition of the Hotel Property by the Liquidating Trustee, who in turn will be empowered to and have responsibility to effectuate in a prompt and orderly manner the implementation of a marketing process (with the assistance of the Hotel Broker) by which the Hotel Property will be sold after reasonable exposure to the marketplace, with such sale to be free and clear of any and all liens, claims and encumbrances of whatever kind and/or nature (with any such liens, claims and encumbrances to attach to the proceeds of sale and thereupon be dealt with as provided in the Plan), and with the net proceeds realized upon the consummation of any such sale to be distributed in accordance with the terms of the Plan. Consistent therewith, among other things on the Effective Date the Plan Proponent and the Liquidating Trustee will execute the (i) Liquidating Trust Agreement, thereby establishing the Liquidating Trust and empowering the Liquidating Trustee in accordance with the terms thereof and the Plan, and (ii) the Liquidating Trustee, on behalf of the Liquidating Trust, will execute the Hotel Broker Engagement Agreement with the Hotel Broker, thus commencing the marketing process for the Sale of the Hotel Property.

- Section 1123(a)(6) of the Bankruptcy Code: The Plan is in essence a liquidating plan, which in turn will result in the permanent cancellation of all Equity Interests in the Debtor and the eventual dissolution of the Debtor as a corporate entity. Accordingly, there will be no non-voting equity securities in the Debtor.

- Section 1123(a)(7) of the Bankruptcy Code: Upon the occurrence of the Effective Date, the Liquidating Trustee will be vested with the power to direct the affairs of the Debtor as provided in the Liquidating Trust Agreement and the Plan. In addition, Section 7.5 of the Plan provides that the following the occurrence of the Effective Date, the Plan Proponent will take appropriate steps in the State Court Action to have the Receiver's appointment terminated. The Plan therefore contains provisions that are consistent with the interests of creditors, equity security holders, and public policy.

b)    **Impairment/Unimpairment of Classes of
Claims and Equity Interests (11 U.S.C. § 1123(b)(1))**

42.    Pursuant to Articles IV, V and VI of the Plan, Classes 1, 2, 3 and 4 have each been classified as being "impaired" under the Plan.

c)    **Assumption and Rejection ((11 U.S.C. § 1123(b)(2))**

43.    The Plan provides for the assumption or rejection of executory contracts and unexpired leases that have not been previously assumed or rejected under section 365 of the Bankruptcy Code. In this regard, Section 8.1 of the Plan provides, in relevant part, that:

> In order to facilitate the sale, transfer and conveyance of the Hotel Property by the Liquidation Trust, the Plan constitutes and incorporates a motion by the Debtor, in accordance with Section 365 of the Bankruptcy Code, to assume and assign to the Plan Proponent (or its designee) those executory contracts and unexpired leases that are designated and identified for assumption by the Plan Proponent under the Stalking Horse Agreement, a schedule of which contracts/leases shall be identified in the Plan Supplement; provided, however, the following contracts and leases shall be excluded from the foregoing general assumption provision: (a) those contracts and/or leases that have already been assumed or have been rejected pursuant to a Final Order of the Bankruptcy Court in accordance with Section 365 of the Bankruptcy Code, (b) those contracts and/or leases that are specifically treated otherwise in this Plan, or (c) those contracts and/or leases that are the subject of a motion to reject that is pending before the Bankruptcy Court on the Effective Date.

Plan Sec. 8.1.

44.    On March 15, 2013, the Plan Proponent filed the Plan Supplement [D.R. No. 181], which included a schedule setting forth those executory contracts and unexpired leases that the Plan Proponent intends to assume and/or assume and assign.[2] The Plan also constitutes and incorporates a motion by the Plan Proponent, in accordance with section 365 of the Bankruptcy Code, to reject any executory contract and/or unexpired lease that is not specifically designated and identified by the Plan Proponent for assumption under the Plan Supplement.

d)    **Settlement/Retention of Claim or Interests (11 U.S.C. § 1123(b)(3))**

45.    Section 1123(b)(3) states that a plan may "provide for — (A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or (B) the retention and enforcement by the debtor . . . or by a representative of the estate appointed for such purpose, of any such claim or interest."

---

[2]    The Plan Proponent reserves the right to modify and amend the assumption schedule to add or delete any executory contract or unexpired lease therefrom or modify any cure amount at any time through and including the Effective Date.

46.     On the Effective Date, any right, claim or cause of action, belonging to the Debtor or its estate against any Person or Entity, including, without limitation, any claim to avoid a transfer under, inter alia, sections 544, 547, 548, 549 or 553(b) of the Bankruptcy Code, shall be transferred, conveyed and assigned by the Debtor to the Liquidation Trust for the ratable benefit of the holders of Allowed Claims and Equity Interests in the order of their respective statutory priorities as set forth in the Bankruptcy Code and as provided for in the Plan. The Liquidating Trustee, on behalf of the Liquidation Trust, shall pursue, settle or release all reserved rights of action, as appropriate, in accordance with the best interest of and for the benefit of the creditors entitled to receive Distributions under the Plan.

### e)     Sale of All or Substantially All Assets (11 U.S.C. § 1123(b)(4))

47.     As noted above, the Plan provides for, among other things, (a) the transfer on the Effective Date of all of the Debtor's Hotel Cash on Hand and other assets and interests to the Liquidation Trust, guided by the Liquidating Trustee, and (b) the sale or other disposition of the Hotel Property by the Liquidating Trustee. As such, the Plan is in essence a liquidating plan, under which the estate's interests in the Debtor's principal assets shall be sold to the highest and/or best bidder at auction.

### f)     Modification of Rights (11 U.S.C. § 1123(b)(5))

48.     As set forth in Article V of the Plan, the Plan modifies the rights of holders of Claims and Equity Interests in Classes 1, 2, 3, and 4, each of which constitutes an "impaired" Class.

### g)     Exculpation; Jurisdiction (11 U.S.C. § 1123(b)(6))

49.     It is my understanding that section 1123(b)(6) of the Bankruptcy Code provides that a plan may "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]." Section 12.4 of the Plan therefore contains certain exculpation provisions limiting the liability of the Debtor and the Plan Proponent (and certain related parties) for actions taken during the Chapter 11 Case and in connection with the Plan, but specifically excluding claims based on gross negligence or willful misconduct, all of which comply with the relevant provisions of the Bankruptcy Code and conform to the requirements in this District.

50.     Based upon the facts and circumstances of the Chapter 11 Case, I believe the exculpation provisions in the Plan are fair, equitable and reasonable, are supported by sufficient and valuable consideration, are necessary for the implementation of the Plan and the realization of value for stakeholders thereunder, and are, in light of the foregoing, appropriate.

51.     Section 11.6 of the Plan also provides that the Court will retain jurisdiction over, among other things, all matters involving the Plan, the claims allowance and distribution process, and the prosecution of Claims. By providing that the Bankruptcy Court retain jurisdiction, the Plan does not create jurisdiction; rather, it merely states that the Bankruptcy Court will retain any jurisdiction it may already have.

### h) <u>Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(2))</u>

52.    The Plan Proponent has complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the DS Approval Order in transmitting the Plan, the Plan Supplement, the Disclosure Statement, the DS Approval Order, the Ballots, and related documents and notices and in soliciting and tabulating the votes on the Plan.

53.    By entry of the DS Approval Order, the Court approved the Disclosure Statement as containing "adequate information" pursuant to section 1125(b) of the Bankruptcy Code. In compliance with the DS Approval Order, on February 22, 2013, the Plan Proponent commenced its solicitation of votes to accept or reject the Plan. *See* Romanik Affidavit. As set forth in the Nizzo Declaration, in accordance with the DS Approval Order, the Plan Proponent's voting and tabulation agent, Riemer & Braunstein LLP ("R&B"), transmitted to each Claim or Equity Interest holder that was entitled to vote to accept or reject the Plan, (i) a copy of the DS Approval Order (without attachments) and the Disclosure Statement (which included the Plan as an attachment), (ii) the notice regarding the Confirmation Hearing, and (iii) a Ballot for that stakeholder. *See* Romanik Affidavit; Nizzo Declaration.

54.    The deadline for voting to accept or reject the Plan was March 22, 2013. The Nizzo Declaration describes R&B's transmission of the aforementioned documents and the methodology for tabulating results of voting and elections with respect to the Plan. *See* Nizzo Declaration.

55.    The impaired Classes entitled to vote on the Plan are Claims, as applicable, in Class 1 (62 Madison Secured Claim), Class 2 (Priority Claims), Class 3 (General Unsecured Claims), and Class 4 (Equity Interests). The Plan Proponent solicited acceptances of the Plan from the holders of all Claims and Equity Interests in each Class of impaired Claims and Equity Interests entitled to receive distributions pursuant to the Plan in accordance with section 1126 of the Bankruptcy Code.

56.    As evidenced in the Nizzo Declaration, the Plan has been accepted by holders of Claims in Class 1 (62 Madison Secured Claim). There were no votes cast in Class 2 (Priority Claims). There was a single vote cast in Class 3 (Unsecured Claims), which has rejected the Plan. There were no votes cast in Class 4 (Equity Interests). *See* Nizzo Declaration.

57.    Notwithstanding the fact that Class 3 has rejected the Plan, and that Classes 2 and 4 having failed to vote are deemed to have abstained (<u>i.e.</u>, shall be deemed to have neither voted for nor against the Plan, *see* DS Approval Order, ¶ 15)), pursuant to section 1129(b) of the Bankruptcy Code the Plan nevertheless may be confirmed because the Plan does not discriminate unfairly and is fair and equitable with respect to each such Class. Based upon the foregoing, the Plan Proponent submits that the requirements of section 1129(a)(2) of the Bankruptcy Code have been satisfied.

i)    **Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3))**

58.    Here, the Plan was proposed with the legitimate and honest purpose of maximizing the value of the Debtor's estate, and maximizing distributions to all creditors. As noted above, the Plan provides for, among other things, (a) the transfer on the Effective Date of all of the Debtor's Hotel Cash on Hand and other assets and interests to the Liquidation Trust, guided by the Liquidating Trustee, and (b) the sale or other disposition of the Hotel Property by the Liquidating Trustee. As such, the Plan is in essence a liquidating plan, under which the estate's interests in the Debtor's principal assets shall be sold to the highest and/or best bidder at auction, following which the net proceeds of such sale shall be distributed to creditors consistent with the Plan – which effectuates the statutory priority scheme embodied in the absolute priority rule. In that respect, the Plan achieves one of the primary objectives underlying a Chapter 11 bankruptcy: the equitable distribution of value to creditors for amounts owing.

59.    Given that the Plan promotes the rehabilitative objectives and purposes of the Bankruptcy Code, I believe the Plan and the related documents have been filed in good faith and that 62 Madison has acted in good faith.

j)    **Payments for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4))**

60.    The Debtor's attorneys, accountants, and other agents must comply with the statutory procedures and related Plan provisions and submit an application for final allowance of compensation for professional services rendered and reimbursement of expenses incurred. Pursuant to the Plan, the Court shall retain exclusive jurisdiction over all applications for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date. *See* Plan Sec. 11.6(b). Furthermore, the Plan only provides for the payment of Allowed Administrative Claims.

k)    **Directors and Officers (11 U.S.C. § 1129(a)(5))**

61.    As noted above, upon the occurrence of the Effective Date, the Liquidating Trustee will be vested with the power to direct the affairs of the Debtor as provided in the Liquidating Trust Agreement and the Plan. Furthermore, in the Plan Supplement the Plan Proponent has identified the individual/firm proposed to serve in the role of "Liquidating Trustee" after confirmation of the Plan, as well as the relevant engagement terms and conditions. As such, the requisite identifications have been fully disclosed to the extent such information is available, and the appointment to, or continuance in, such offices of such persons is consistent with the interests of holders of Claims against and Equity Interests in the Debtor and with public policy.

l)    **No Rate Changes (11 U.S.C. § 1129(a)(6))**

62.    Through the Plan, the Plan Proponent is not changing any rates that require approval of a governmental agency and the Plan does not provide for any changes in any rates subject to such regulatory approval.

### m) <u>Acceptance by Impaired Classes (11 U.S.C. § 1129(a)(7))</u>

63.     I believe that the so-called "best interests" test is satisfied as to each holder of a Claim in an impaired Class of Claims, as well as with respect to each holder of an Equity Interest, that has rejected the Plan.

64.     As noted above, the Plan is in essence a liquidating plan, under which the estate's interests in the Debtor's principal assets shall be sold to the highest and/or best bidder at auction, following which the net proceeds of such sale shall be distributed to creditors consistent with the Plan – which effectuates the statutory priority scheme embodied in the absolute priority rule. In that connection, the Plan provides for, among other things, (a) the transfer on the Effective Date of all of the Debtor's Hotel Cash on Hand and other assets and interests to the Liquidation Trust, guided by the Liquidating Trustee, and (b) the sale or other disposition of the Hotel Property by the Liquidating Trustee. The implementation of the orderly sale process embodied in the Plan, coupled with the Plan's straightforward effectuation of the absolute priority rule in distributing net sale proceeds, demonstrates that the Debtor's creditors will receive no less value under the Plan than they would receive in a hypothetical Chapter 7 liquidation.

### n) <u>Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8))</u>

65.     As set forth above and in the Nizzo Declaration, holders of Claims in Class 1 voted to accept the Plan. As such, section 1129(a)(8) is satisfied with respect to Class 1. As also set forth above and in the Nizzo Declaration, holders of Claims in Class 3 voted to reject the Plan, and holders of Claims in Classes 2 and 4 failed to vote on the Plan, and as such each such Class is deemed to have either rejected the Plan or abstained. Nonetheless, the Plan may be confirmed pursuant to the "cram down" provisions of section 1129(b) of the Bankruptcy Code.

### o) <u>Treatment of Administrative, Priority Non-Tax, Priority Tax, and Secured Tax Claims (11 U.S.C. § 1129(a)(9))</u>

66.     With respect to Administrative Claims, Section 3.1 of the Plan provides that except to the extent the holder of an Allowed Administrative Claim agrees otherwise, each holder of an Allowed Administrative Claim shall be paid the full amount thereof from Hotel Cash on Hand, in Cash and without interest, as soon as practicable after the later of (i) the Effective Date, (ii) the date on which such Administrative Claim becomes an Allowed Administrative Claim.

67.     With respect to Priority Non-Tax Claims, Section 6.3 of the Plan provides that, Allowed Priority Claims shall be paid, at the election of the Plan Proponent, in full, in Cash from Hotel Cash on Hand, either (x) on the Effective Date, or (y) in equal annual installments payable over the period that is five (5) years from the Effective Date, except to the extent the holder of an Allowed Priority Claim agrees otherwise. Upon a consummation of a sale of the Hotel Property by the Liquidating Trustee in accordance

with the terms of this Plan, any remaining unpaid installments in respect of an Allowed Priority Claim shall be deemed accelerated and shall be paid from net distributable Hotel Property Sale Proceeds. Until paid, and provided that there are available funds to make such payment, such Priority Claims shall accrue simple interest on the remaining unpaid balance thereof from the Effective Date until the date such claim is paid in full at the rate of 4.5%.

68.    With respect to Priority Tax Claims, Section 3.3 of the Plan provides that Allowed Priority Tax Claims shall be paid, at the election of the Plan Proponent, in full, in Cash from Hotel Cash on Hand, either (x) on the Effective Date, or (y) in equal annual installments payable over the period that is five (5) years from the Petition Date, except to the extent the holder of an Allowed Priority Tax Claim agrees otherwise. Upon the consummation of a sale of the Hotel Property by the Liquidating Trustee in accordance with the terms of this Plan, any remaining unpaid installments in respect of an Allowed Priority Tax Claim shall be deemed accelerated and shall be paid from net distributable Hotel Property Sale Proceeds. Until paid, such Priority Tax Claims shall accrue statutory interest from the Effective Date, fixed at the applicable federal or state statutory rate as in effect with respect to such claim on the Effective Date.

69.    As also noted above, in the event that the aggregate of Hotel Cash on Hand and Hotel Property Sale Proceeds is not sufficient to pay Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and the Class 1 Secured Claim in full in accordance with the Plan, the Plan Proponent shall contribute such supplemental Cash as may be required to pay Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims in accordance with the Plan.

**p)    Acceptance by Impaired Classes of Claims (11 U.S.C. § 1129(a)(10))**

70.    One (1) impaired Class entitled to vote affirmatively accepted the Plan (Class 1 – 62 Madison Secured Claim) by the requisite majorities, determined without including any acceptance of the Plan by any insider.

**q)    Feasibility (11 U.S.C. § 1129(a)(11))**

71.    In the context of the Plan, feasibility is established by demonstrating the Plan Proponent's ability to (i) successfully implement the reorganization strategies contemplated by the Plan without there being a likelihood for a need for further financial reorganization, (ii) satisfy the conditions precedent to the Effective Date, and (iii) otherwise have sufficient funds to meet post-Confirmation Date obligations, including paying for the costs of administering and fully consummating the Plan.

72.    Since, as noted above, the Plan is in essence a liquidating plan, under which the estate's interests in the Debtor's principal assets shall be sold to the highest and/or best bidder at auction, following which the net proceeds of such sale shall be distributed to creditors consistent with the Plan.

Consequently, I believe that the Plan is "feasible" and that there are adequate means for its implementation.

**r) Payment of Fees (11 U.S.C. § 1129(a)(12))**

73. Section 31.12 of the Plan provides that all fees payable to the Office of the United States Trustee, as determined by the Bankruptcy Court, shall be paid on the Effective Date or thereafter as and when they become due and owing.

**s) Continuation of Retiree Benefits (11 U.S.C. § 1129(a)(13))**

74. The Plan does not attempt to alter retiree benefits, if any.

**t) 11 U.S.C. §§ 1129(a)(14), 1129(a)(15) and 1129(a)(16) Are Inapplicable**

75. The Debtor is not an "individual" and, accordingly, section 1129(a)(15) is inapplicable.

76. The Debtor is a limited liability company, and thus section 1129(a)(16) is inapplicable.

**u) Confirmation of the Plan Over
Nonacceptance of Impaired Classes (11 U.S.C. § 1129(b))**

77. As set forth above, Class 1 (62 Madison Secured Claim) is impaired and has voted to accept the Plan. Conversely, Class 3 (Unsecured Claims) is impaired and has voted to reject the Plan, and Classes 2 and 4 have failed to vote, and thus have abstained. I nevertheless believe that the Plan may be confirmed as to each of these Classes pursuant to the "cram down" provisions of section 1129(b) of the Bankruptcy Code.

78. The Plan does not "discriminate unfairly" with respect to any impaired Claim or Equity Interest, in that all General Unsecured Claims are classified together, as are all Equity Interests, and each such Claim or Equity Interest is afforded the same treatment as similarly situated Claims and Equity Interests under the Plan. Moreover, Class 2 non-Tax Priority Claims are all classified together, and each such Claim is afforded the requisite statutory treatment provided under the applicable provisions of the Bankruptcy Code. Accordingly, the treatment under the Plan of Classes 2, 3 and 4 does not constitute unfair discrimination.

79. Furthermore, distributions under the Plan are proposed to be made strictly in the order of priority proscribed by the Bankruptcy Code and in accordance with the absolute priority rule. Accordingly, the Plan is "fair and equitable" with respect to Claims and Equity Interests in Classes 2, 3 and 4, respectively. Additionally, pursuant to the Plan, no holder of an Equity Interest will receive a distribution except from residual estate proceeds following the payment in full of all claims that are senior in priority.

**q)  Principal Purpose of the Plan (11 U.S.C. § 1129(d))**

75.    The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933 and no governmental entity has objected to the confirmation of the Plan on any such grounds.

In light of the foregoing I believe that confirmation of the Plan is appropriate, is in the best interests of all parties in interest and should be approved.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 5th day of April, 2013

62 MADISON LENDER, LLC,
As Plan Proponent

By:  62 Madison Loan Holdings, LLC

By:  MC 62 MAD Investor LLC

By:  MC 62 MAD Manager LLC

By: _____
David J. Steinberg

Sworn to before me this 5th day of April, 2013

Notary Public

JILL P. GRABEL
Notary Public, State of New York
Qualified in New York County
No. 01GR6100098
My Commission Expires Feb. 27, 20___

1542602.2