## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT ("**Agreement**") is entered into as of July 1, 2013 ("**Effective Date**"), by and between **ASSA PROPERTIES INC.** ("**Buyer**"), and **MADISON HOTEL, LLC, by and through the MADISON HOTEL LIQUIDATION TRUST** (the "**Trust**", established under that certain Second Modified Third Amended Plan of Reorganization for Madison Hotel, LLC, dated November 9, 2012) ("**Seller**"), with reference to the Recitals set forth below. Seller and Buyer are sometimes hereinafter referred to individually as a "**Party**" and collectively as the "**Parties**".

## R E C I T A L S:

A.    Seller is currently the fee title owner of that certain hotel property known as the "MAve Hotel" located at 62 Madison Avenue, New York, New York 10016, and all of the Seller's property related thereto or associated therewith as more particularly described in **Exhibit "A"** attached hereto and incorporated herein by this reference (the "Land").

B.    On May 26, 2011 ("**Petition Date**"), Seller filed a voluntary petition for relief (the "**Chapter 11 Case**") under Chapter 11 of Title 11, United States Code (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York ("**Bankruptcy Court**"). Since the Petition Date, Seller has continued operating its businesses and properties, including the Property (defined below).

C.    Pursuant to that certain "Order Confirming Second Modified Third Amended Plan of Reorganization for Madison Hotel, LLC", dated May 8, 2013 (the "**Confirmation Order**"), the Bankruptcy Court confirmed that certain Second Modified Third Amended Plan of Reorganization for Madison Hotel, LLC, dated November 9, 2012 (the "**Plan**"). In accordance with the terms of the Plan, the Madison Hotel Liquidation Trust was established to, among other things, liquidate, collect, and distribute: (i) the Hotel Property, and all of the Seller's rights, title and interests therein, including, without limitation, any improvements, accessions and appurtenances thereto; (ii) Hotel Property Sale Proceeds; (iii) Avoidance Actions; (iv) Causes of Action; (v) the proceeds of Avoidance Actions and Causes of Action, if any; and (vi) such other claims or other assets of the Debtor that the Plan Proponent may, with the consent of the Liquidating Trustee, designate from time to time (each such term as defined in the Plan).

D.    In exchange for, among other things, payment of the Purchase Price, Seller desires to sell the Property to Buyer, and Buyer desires to purchase the Property from Seller, in each case upon the terms and conditions set forth in this Agreement, and subject further to the approval of this Agreement by the Bankruptcy Court as set forth more fully hereinbelow.

E.    The Parties desire to enter into this Agreement to document the purchase and sale of the Property between Seller and Buyer, subject to all of the terms and conditions set forth herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Buyer and Seller hereby agree as follows:

## AGREEMENT

1.    <u>Purchase and Sale of Property</u>.  Seller hereby agrees to sell, grant and convey to Buyer, and Buyer hereby agrees to purchase from Seller, at a price and upon the terms and conditions set forth in this Agreement, a fee simple interest in the Land described in <u>Exhibit A</u> annexed hereto and made a part hereof.  There is included in the foregoing fee simple interest being conveyed all of the right, title and interest, if any, of Seller in and to:

1.1 <u>Improvements</u>. The buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements erected or located on the Land (collectively the "**Improvements**");

1.2 <u>Easements</u>.  All easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever with respect to the Land or Improvements, and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy, property, possessions, claim and demand whatsoever, both at law and in equity, of Seller of, in and to the Land and the Improvements and every part and parcel thereof, with the appurtenances thereto (the "**Easements**");

1.3 <u>Personal Property</u>. All tangible personal property owned by Seller that is currently placed or installed in, on or about the Land and Improvements, used in connection with the use, ownership, operation, management, maintenance and/or repair of the Land and Improvements, including, without limitation, to the extent located on the Land and/or Improvements and owned by Seller: (i) all machinery, equipment, fixtures (including, but not limited to, all heating, air conditioning, plumbing, lighting, communications and elevator fixtures), furnishings, furniture, inventory and other property of every kind and nature whatsoever (collectively, the "**Personal Property**");

1.4 <u>Intangible Property</u>.  All of Seller's right, title and interest in, to and arising out of, the property and/or development entitlements related to the Property, including, but not limited to, all permits, licenses, rights of way, plans, maps, specifications, surveys, warranties, guaranties, agreements, contracts, air rights, if any, off-site parking rights, approvals, utility rights, development rights and similar rights related to the Property, whether granted by governmental or quasi-governmental authorities or private persons (collectively, the "**Intangible Property**");

1.5 <u>Records</u>. All records, statements, invoices, files, books and other data used by Seller and associated primarily with the ownership, use and operation of the Land or Improvements, including the plans, specifications, environmental reports, surveys, engineering

reports and notices from any governmental authority relating to environmental matters, and general records relating to the construction of any proposed or actual Improvements (collectively, the "**Records**");

       1.6 all existing leases, licenses and other occupancy agreements relating to the Property (or any portion thereof) listed on Schedule 12.1.7 (the "Real Property Leases") and any and all tenant refundable deposits and escrows (and any required interest thereon), in the form of cash, letter of credit or otherwise, paid by any tenant (or, in the case of a letter of credit, delivered by the letter of credit issuing bank of any tenant) under any such Real Property Leases and not returned, prior to the Closing Date in accordance with this Agreement (collectively, the "Tenant Deposits");

       1.7 all equipment leases, contracts, agency agreements, supply or maintenance contracts, miscellaneous agreements, telephone numbers, room reservation agreements, "trade-out" agreements, advance booking agreements, convention reservation agreements or similar agreements (including information as to clients, bookings and marketing activities), applications and other records of Seller pertaining to the use, marketing, promotion and operation of the Property including all prepaid rents and deposits, refundable security deposits, rental deposits and all guaranties by third parties, including, only the executory contracts and unexpired leases that were assumed by the Debtor pursuant to section 365 of the Bankruptcy Code in the Chapter 11 Case listed on Schedule 1.7 (all of the foregoing are collectively referred to as the "Assumed Agreements")

       1.8 all inventories owned by Seller and used in connection with or relating to the Property, including provisions in storerooms, or other merchandise intended for sale or resale, fuel, mechanical supplies, stationery, guest supplies, maintenance and housekeeping supplies, unused food and beverages and other supplies and similar items (with respect to the Property, all of the foregoing are collectively referred to as the "Consumables and Inventories").

       1.9 Property. The Land, together with the Improvements, Easements, Personal Property, Intangible Property, and Records, Real Property Leases, Assumed Agreements and Consumables and Inventories are collectively hereinafter referred to as the "**Property**". The Property consists of and shall consist of a 72 room hotel with 2,200 square feet of retail and a gym.

   2.    Purchase Price. The purchase price for the Property to be paid to Seller by Buyer shall be Twenty-Eight Million Eight Hundred Thousand Dollars ($28,800,000.00) (the "**Purchase Price**"), plus or minus any applicable prorations, calculated and payable as hereinafter provided.

     2.1    Payment of Purchase Price. The Purchase Price shall be payable upon the Closing Date in accordance with the following procedures:

       2.1.1    Earnest Money. Prior to the date hereof, Buyer deposited into escrow with Regal Abstract Corp. d/b/a Regal Title Agency, an independent escrow agent, in immediately available funds, the sum of $750,000 (the "**First Deposit**"), which shall be applied toward the Purchase Price. Contemporaneously with the execution of this Agreement, Buyer and

Seller executed that Escrow Agreement, dated July 1, 2013 ("**Escrow Agreement**"), among Seller, Buyer and Madison Title Agency, an independent escrow agent ("**Escrow Agent**"). Within four (4) business days after execution of this Agreement, Buyer will deposit with Escrow Agent an additional $690,000 (the "**Second Deposit**") and Seller shall direct the First Deposit to be transferred to the Escrow Agent. Within ten (10) business days of notice from Seller of Bankruptcy Court Approval (as defined herein), Buyer will deposit with Escrow Agent an additional $1,440,000 (the "**Third Deposit**" and collectively with the First and Second Deposit, the "**Earnest Money**"); provided, however, that in the event that Bankruptcy Court Approval is not obtained within ninety (90) days of the date that Buyer and Seller execute this Agreement, then, at Buyer's election, this Agreement shall be null and void, Buyer shall have no obligation to fund the Third Deposit, and Escrow Agent shall promptly return to Buyer the full amounts of the First and Second Deposits. If Bankruptcy Court Approval is obtained within ninety (90) days of the date that Buyer and Seller execute this Agreement, Buyer shall then have sixty (60) days following Bankruptcy Court Approval to Close as provided herein. In the event that Buyer fails to Close within such sixty-day (60 day) period, the Escrow Agent shall dispose of the Earnest Money pursuant to Section 17 or 18 hereof, as applicable. Except as provided otherwise herein, the Earnest Money shall be non-refundable to Buyer, and shall be held by the Escrow Agent pursuant to the terms of this Agreement and the Escrow Agreement. Buyer may replace the First, Second and/or Third Deposits with a letter of credit reasonably satisfactory to Seller.

2.1.2    Balance of Purchase Price. The balance of the Purchase Price ("**Balance**"), together with all other funds necessary on the part of Buyer, shall be paid by Buyer to Seller (or its designee) in immediately available funds on sixty (60) days after Bankruptcy Court Approval at 10 A.M. at the office of Purchase's lender's counsel's office (the "**Closing Date**"). For purposes of calculating the Balance of the Purchase Price payable by Buyer hereunder, Buyer shall be credited with (i) the Earnest Money, and (ii) Buyer's share of the prorations in Buyer's favor and other credits described in Section 11 hereof. The parties hereby agree that all investment earnings, if any, on the Earnest Money that are earned while in escrow shall be payable to the party entitled to the Earnest Money and, if paid to Seller, shall be a credit against the Purchase Price. Subject to the provisions of this Agreement and by accepting the instruments of transfer to be delivered by Seller to Buyer pursuant to this Agreement, on the Closing Date:

(i)    The Earnest Money shall be paid over free of escrow and delivered by Seller's counsel to Seller (or Seller's designee) for application toward the cash portion of the Purchase Price due at Closing; and

(ii)    Buyer shall pay Seller (or Seller's designee) the all cash sum equal to the Balance plus or minus prorations and other credits described in Section 11 hereof, in immediately available funds for payment of the balance of the Purchase Price due at Closing.

2.1.3    Allocation of Purchase Price. Seller and Buyer hereby agree that for applicable State, city and/or county transfer and sales tax purposes, the Purchase Price shall be allocated between the fee simple interest(s) and Personal Property by Buyer and Seller, acting reasonably, within thirty (30) days following the Effective Date. Seller and Buyer hereby agree

that each will reflect the allocation of the Purchase Price in a manner consistent herewith on any of their respective transfer and sales tax returns.  Seller shall pay any applicable sales tax.

3.    Title to Property.

3.1 Title and Survey.  Buyer agrees that any examination of title with respect to the Property it may make or cause to be made for the purpose of obtaining title insurance in connection with the acquisition by the Buyer of the Property pursuant to the provisions hereof will be made and the title policy in respect thereof (the "**Title Policy**") will be issued through any reputable title or abstract company licensed in the State of New York (the "**Title Company**"). Following execution of this Agreement, Buyer will order its Title Company to prepare and issue a certificate of title (the "**Title Report**") with respect to the Property.  All of the foregoing shall be accomplished at Buyer's cost and expense and without contribution by Seller, as shall any survey (the "**Survey**") of the Property ordered or obtained by Buyer or the Title Company.

3.2 Title and Survey Exceptions.  In the event that the Title Report or the Survey discloses title exceptions encumbering the Property (other than any resulting from Buyer's activities on the Land and Improvements, and other than any exception deemed to be a "**Permitted Exception**" by Buyer or by this Agreement), Buyer shall have a ten (10) day period following Buyer's receipt of the Title Report to approve or disapprove such item in its reasonable discretion ("**Title Objections**").  Seller shall have a period of ten (10) business days following its receipt of such notice of its willingness to remove, alter, modify or otherwise mitigate to the satisfaction of Buyer and Title Company any Title Objection ("**Title Objection Response**"). Seller's failure to timely provide a Title Objection Response will be deemed a rejection by Seller to cure the Title Objections prior to the Closing Date. In the event that Seller is not willing to remove, alter, modify or otherwise mitigate any Title Objections to the satisfaction of Buyer and Title Company, Buyer shall elect, prior to the expiration of the date that is five (5) days after Buyer's receipt of the Title Objection Response or the expiration of the period for the delivery of the Title Objection Response, to either (i) waive its disapproval of such exception, in which case such exception shall then be deemed to be a Permitted Exception, or (ii) terminate its obligation to purchase the Property. Buyer's failure to give such notice shall be deemed an election to terminate its obligation to Purchase the Property.  In the event Buyer elects to terminate its obligation to purchase the Property in accordance with this paragraph, Buyer's obligation to purchase, and Seller's obligation to sell, the Property shall terminate, and neither Party shall have any further obligation to the other except as otherwise provided in this Agreement but the Earnest Money shall be refunded to Buyer.

4.    Due Diligence.

4.1    Inspections. During the period commencing on the Effective Date hereof until Buyer's rights to purchase the Property have terminated in accordance herewith, Buyer (and its agents and representatives) may, but shall not be obligated to, enter onto the Land and Improvements during reasonable business hours and upon reasonable prior notice to Seller to perform a complete review of the Land and Property and all matters related to Buyer's acquisition of the Property in Buyer's sole and absolute discretion and to perform inspections

and tests of the Land and Improvements in Buyer's sole and absolute discretion, including, but not limited to, geotechnical soil borings, test pits and other environmental tests of the Land and Improvements, all at Buyer's sole cost and expense. Buyer agrees that it shall, at its sole cost and expense, repair any damage to the Land and Improvements that was caused by any inspection or testing of the Land and Improvements by or at the direction of Buyer. **Notwithstanding anything contained in this Paragraph 4.1 to the contrary, except as expressly provided by this Agreement, Buyer shall have no right to terminate this Agreement based upon any further inspections or due diligence conducted by Buyer as permitted under this Agreement following the Effective Date**.

4.1.1    <u>Inspection Conditions</u>. Buyer's right to enter upon the Property to conduct the inspections is subject to the following conditions:

(a)    Buyer shall provide Seller with reasonable advance notice of any entry by Buyer, and Seller may, at its election, have an authorized representative present during any such entry;

(b)    All investigations and other activities conducted by Buyer shall be at Buyer's sole cost and expense, and Buyer shall keep the Property free of any liens that may be asserted against Seller or the Property as a result thereof;

(c)    Buyer shall exercise due care with respect to the Property in connection with its entry thereon so as to minimize any damage caused to the Property and any interference with the use thereof by Seller. Promptly following any test or other examination that results in any alteration of the Property, Buyer will promptly restore the Property at Buyer's sole cost and expense to the condition that existed prior to such test or examination; and

(d)    Buyer agrees that neither Buyer nor its representatives will contact any utilities or governmental authority unless required by applicable laws, and in all events Buyer agrees not to make such contact without first notifying Seller of its intention to do so and providing Seller or its representatives with a reasonable opportunity to be present at and participate in such discussion at a time and location reasonably acceptable to all parties.

4.1.2    <u>Indemnity</u>.    To the fullest extent permitted by law and in addition to all other indemnities provided for at law or in equity, Buyer shall protect, indemnify and hold the Property, Seller, and Seller's respective members, participants and affiliates, and the officers, directors, shareholders, employees, agents, representatives, contractors and invitees of all of the foregoing (collectively, "**Seller Parties**") harmless from and against any and all claims, damages, liens, liabilities, losses, costs and expenses including, without limitation, reasonable attorneys' fees and court costs, that Seller shall suffer or incur as a direct result of or otherwise arising out of any negligent, criminal or tortious acts or omissions committed by Buyer or its representatives or agents in connection with the exercise of the rights granted to Buyer in this Article 4. In the event this Agreement is terminated, this indemnification obligation shall survive the termination of this Agreement. If this Agreement is not terminated, this indemnification obligation shall survive the closing.

4.1.3    Confidentiality. All information obtained by Buyer through its inspections of the Property (including, without limitation, financial matters such as, but not limited to, costs, expenses and income of the Property and/or other matters obtained by Buyer pertaining to Seller) shall be deemed Transaction Materials as defined in Paragraph 21.14 (Confidentiality) below.

4.2    Review of Documents. At Buyer's request, Seller shall make available to Buyer copies of all books, files, records, documents, agreements, contracts, reports and other materials related to the Land and/or Property that are in Seller's possession or control, applicable to the Property and not otherwise publicly available (collectively, the "**Due Diligence Items**"), which Due Diligence Items shall be deemed Transaction Materials as defined in Paragraph 21.14 (Confidentiality) below. During the period commencing on the Effective Date hereof until Buyer's rights to purchase the Property have terminated in accordance herewith, Buyer (and its agents and representatives) shall have the opportunity to review any items delivered to Buyer pursuant to Paragraph 3 above, the Due Diligence Items, and any other materials Buyer may elect to obtain and review with respect to the Land and/or Property; provided, however, except as expressly provided by this Agreement, Buyer shall have no right to terminate this Agreement based upon any further inspections or due diligence conducted by Buyer as permitted under this Agreement following the Effective Date.

4.3    Due Diligence. Buyer shall continue to have the right to conduct any and all inspections, tests and due diligence investigations that Buyer is otherwise permitted to perform under this Agreement prior to the Closing Date; provided, however, except as expressly provided by this Agreement, Buyer shall not have a right to terminate this Agreement based upon such inspections.

5.    Conditions Precedent.    The following shall be the conditions precedent to the Parties' obligations to consummate the purchase and sale transaction contemplated herein:

5.1    Conditions to Buyer's Obligations. Buyer's obligations hereunder, including, but not limited to, its obligation to consummate the purchase transaction provided for herein, are subject to the satisfaction, in Buyer's sole and absolute discretion, of each of the following conditions, each of which is for the sole benefit of Buyer and may only be waived by Buyer in writing:

5.1.1    Due Performance. Seller shall have duly performed in all material respects each and every covenant, undertaking and agreement to be performed by it prior to the Closing Date hereunder.

5.1.2    Seller's Representations and Warranties. Each representation and warranty made in this Agreement by Seller shall be true and correct in all material respects at the time as of which the same is made and as of the Closing Date.

5.1.3    Condemnation/Casualty. This Agreement shall not have been terminated by Buyer as a result of any casualty, condemnation or threatened condemnation of the Land as described in Paragraph 16 hereof.

5.1.4    <u>Seller Deliveries</u>.    Seller shall have delivered the items described in Paragraph 7 hereof.

5.1.5    <u>Bankruptcy Court Approval</u>. In accordance with Section 7.1 of the Plan, the Bankruptcy Court shall have approved the sale, transfer and conveyance of the Property to Buyer in accordance with the Plan and this Agreement.

5.2    <u>Buyer's Waiver of Conditions</u>.    Buyer may at any time or times on or before the Closing Date, at its election, waive any of the conditions precedent to Buyer's obligations under Paragraph 5.1 or otherwise and consummate the sale, but any such waiver shall be effective only if contained in a writing signed by Buyer and delivered to Seller.  In the event any of the conditions precedent for the benefit of Buyer that are contained in this Agreement are not fulfilled, then in addition to any other rights or remedies Buyer may have, Buyer may terminate its obligation to purchase the Property, and Buyer's obligation to purchase, and Seller's obligation to sell, the Property shall terminate, and neither Party shall have any further obligation to the other except as otherwise provided in this Agreement except that the Earnest Money shall be refunded to Buyer.

5.3    <u>Conditions to Seller's Obligations</u>.    Seller's obligations hereunder, including, but not limited to, its obligation to consummate the purchase transaction provided for herein, are subject to the satisfaction, in Seller's sole and absolute discretion, of each of the following conditions, each of which is for the sole benefit of Seller and may be waived by Seller in writing:

5.3.1    <u>Buyer Deliveries</u>.  Buyer shall have delivered the items required to be delivered by Buyer pursuant to Paragraph 8 hereof.

5.3.2    <u>Due Performance</u>. Buyer shall have duly performed in all material respects each and every covenant, undertaking and agreement to be performed by it prior to the Closing Date hereunder.

5.3.3    <u>Bankruptcy Court Approval</u>. In accordance with Section 7.1 of the Plan, the Bankruptcy Court shall have approved the sale, transfer and conveyance of the Property to Buyer in accordance with the Plan and this Agreement.

5.3.4    <u>Buyer's Representations and Warranties</u>.  Each representation and warranty made in this Agreement by Buyer shall be true and correct in all material respects at the time as of which the same is made and as of the Closing Date.

5.4    <u>Seller's Waiver of Conditions</u>.  Seller may at any time or times on or before the Closing Date, at its election, waive any of the conditions precedent to Seller's obligations under Paragraph 5.3 or otherwise and consummate the sale, but any such waiver shall be effective only if contained in a writing signed by Seller and delivered to Buyer.  In the event any of the conditions precedent for the benefit of Seller that are contained in this Agreement are not fulfilled, then Seller may terminate its obligation to sell the Property, and Buyer's obligation

to purchase, and Seller's obligation to sell, the Property shall terminate, and neither Party shall have any further obligation to the other except as otherwise provided in this Agreement.

6.    Seller's Covenants.

6.1    Operation of the Property Prior to Closing Date. Until the earlier of the Closing Date or the termination by Buyer or Seller of its obligation to complete the transfer of the Property:

6.1.1    Insurance, Encumbrances, Intangible Property and Agreements. Seller shall (A) manage and maintain the Property in the ordinary course of business and in a manner consistent with the current management of the Property, (B) maintain property and liability insurance related to the Land, Improvements and Personal Property at the level and with the insurance companies that Seller currently maintains, (C) comply with all federal, state, local and other laws, ordinances, rules, regulations and orders affecting or governing the use, occupancy, ownership or maintenance of the Land and Improvements and promptly furnish Buyer with copies of any and all written notices or communications that it receives from any governmental or quasi-governmental entities regarding any violation by Seller of any such laws, and (D) not (except as otherwise specifically permitted or required pursuant to this Agreement, or as otherwise agreed or permitted by Buyer in writing in Buyer's reasonable discretion) (i) grant, create or allow the creation of any easement, right-of-way, encumbrance, lien, restriction, or assessment on title that affects the Land and/or Improvements, (ii) amend, extend or otherwise modify the terms (or otherwise permit the amendment, extension or modification of the terms) of any existing lease, easement, right-of-way, encumbrance, lien, restriction or assessment that affects the Land and/or Improvements, (iii) sell, transfer or otherwise convey or terminate, amend or otherwise modify any Personal Property or Intangible Property, or (iv) enter into any further or amend any existing agreements, contracts or leases with respect to the Land and/or Improvements.

6.1.2    Transfer of Property. Except as otherwise provided in Section 22 herein in connection with agreements with other Qualifying Bidders under the Bidding Procedures and subject to Bankruptcy Court Approval (as such terms are defined hereinafter), or as may otherwise be consented to by Buyer in writing, which consent may be withheld by Buyer in its sole and absolute discretion, Seller will not (i) enter into any contract for the sale or of the Property to any person other than Buyer, or (ii) sell, convey, lease or otherwise transfer all or any part of the Property to any person other than Buyer.

6.1.3    Cooperation with Buyer. Subject to Paragraph 21.14 below, Buyer and its representatives, employees, agents and independent contractors may meet with all applicable governmental and quasi-governmental agencies and entities, and all other persons or entities with whom Seller or others have contractual arrangements in connection with or relating to the Land and/or Property; provided that in each case Buyer gives Seller prior reasonable notice of any such meetings and the right to have a representative of Seller attend such meetings.

6.2    Additional Disclosures. Seller shall promptly advise Buyer in writing of any material adverse change in the condition of the Land or any of the Property, the occurrence

of any event or the discovery of any fact which would render any representation or warranty of Seller to Buyer in this Agreement untrue or materially misleading, and any written notice or other communication from any third person alleging that the consent of such third person is or may be required in connection with the transactions contemplated by this Agreement.

      6.3     <u>Additional Covenants</u>.

      6.3.1     <u>Service Contracts Covenants</u>.  To the extent transferable, on the Closing Date, Seller agrees to assign to Buyer, without recourse, representation or warranty (except as expressly set forth in this Agreement or such instruments), all of Seller's right, title and interest in, and Buyer agrees to assume all of Seller's obligations accruing on and after the Closing Date under, the written service, maintenance, supply and other agreements relating to the operation of the Property, including all guarantees and warranties, together with all modifications and amendments thereof and supplements relating thereto which are then in effect and not terminated as of the Closing Date (collectively, "**Service Contracts**") as listed on Schedule 1.7, <u>provided,</u> <u>however</u>, Buyer may direct Seller to take action, at Closing, to terminate any of the Service Contracts which are terminable and if there is a cost for such termination, Buyer shall pay the cost thereof when due and payable.

      7.     <u>Seller's Closing Deliveries</u>.  Not less than one (1) business day prior to the Closing Date, Seller shall deliver or cause to be delivered to the Buyer the following items:

      7.1     One (1) Seller-executed and acknowledged counterpart original of a quitclaim deed for the conveyance of a fee simple interest in the Land and any Improvements to Buyer, in proper statutory form and which shall be duly executed and acknowledged by Seller so as to convey to Buyer the fee simple interest in the Land and any Improvements (the "**Deed**");

      7.2     A Certificate of Non-Foreign Status duly executed by Seller certifying that Seller is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986, (the "**Non-Foreign Affidavit**");

      7.3     Two (2) Seller-executed counterpart originals of an assignment agreement (the "**Assignment**") conveying to Buyer the Intangible Property in the form attached hereto as **Exhibit "C"**;

      7.4     One (1) fully-executed original of a bill of sale (the "**Bill of Sale**") conveying to Buyer the Personal Property and Records in the form attached hereto as **Exhibit "D"**;

      7.5     Originals of all Intangible Property and other Due Diligence Items in Seller's possession or control;

      7.6     To the extent not previously delivered to Buyer, all originals (or copies if originals are not available) of the Intangible Property, Records, which are located at or relate to

the Property on the Closing Date and shall be deemed to be delivered to Buyer or its permitted designee upon delivery of possession of the Property;

7.7     Except to the extent exempted under Section 1146(a) of the Bankruptcy Code, the Plan and Confirmation Order, New York State and any applicable county or city real property transfer tax returns and forms required to be completed by Seller, together with payment to the Title Company of an amount necessary to pay all real property transfer taxes;

7.8     A certificate from Seller to Buyer certifying that all of Seller's representations and warranties set forth in this Agreement are true and correct as of the Closing Date except as otherwise disclosed in such certificate (it being agreed that any such disclosures shall not permit Buyer to terminate this Agreement unless they result in the failure of a condition under Section 5.1 hereof);

7.9     Any other document, instrument or agreement necessary to consummate the transactions contemplated herein reasonably requested by Buyer or the Title Company.

7.10    Intentionally Omitted

7.11     to the extent in Seller's possession, computer and security codes, and keys relating to the operation, use and maintenance of the Property.


8.     <u>Buyer's Closing Deliveries</u>.  On or prior to the Closing Date, Buyer shall deliver to Seller the following items:

8.1     One (1) Buyer-executed and acknowledged counterpart original of the Deed;

8.2     Two (2) Buyer-executed counterpart originals of the Assignment;

8.3     Except to the extent exempted under Section 1146(a) of the Bankruptcy Code, the Plan and Confirmation Order, New York State and any applicable county or city real property transfer tax returns and forms required to be completed by Buyer;

8.4     A certificate from Buyer to Seller certifying that all of Buyer's representations and warranties set forth in this Agreement are true and correct in all material respects as of the Closing Date except as otherwise disclosed in such certificate (it being agreed that any such disclosures shall not permit Seller to terminate this Agreement unless they result in the failure of a condition under Section 5.3 hereof); and

8.5     Any other documents, instruments or agreements necessary to consummate the transactions contemplated herein reasonably requested by Seller or the Title Company.

9.     <u>Intentionally Omitted</u>.

10.    <u>Closing Costs</u>.    Except to the extent exempted under Section 1146(a) of the Bankruptcy Code, the Plan and Confirmation Order, Buyer shall pay (i) intentionally omitted; (ii) any transfer taxes and/or fees, if any, payable solely upon any assignment or transfer of this Agreement by Buyer; (iii) all reconveyance fees relating to any existing liens or monetary encumbrances affecting the Land; (iv) Title Company's charges for the Preliminary Title Report and the portion of the title insurance premium for the Title Policy equal to the premium that would be payable for a standard coverage ALTA Form B owner's title insurance policy; and (v) the cost of the Survey and any updates thereto. The foregoing provisions of this paragraph notwithstanding, should the obligations of Buyer to purchase, and Seller to sell, the Property be terminated in accordance with this Agreement, Buyer and Seller shall each pay one-half of the cost of the amounts due the Title Company; <u>provided</u>, <u>however</u>, that should this Agreement be terminated as a result of the default by one of the Parties hereto, the defaulting Party shall pay the entire amount of the cancellation fees and other amounts due the Title Company, and the non-defaulting Party shall have no liability therefor. Anything herein to the contrary notwithstanding, Buyer and Seller shall each pay their own attorneys' fees in connection with the preparation and negotiation of this Agreement and in connection with the consummation of the transactions contemplated hereby.

11.    <u>Prorations</u>. All taxes and assessments applicable to the Land and/or Property, including, without limitation, all property taxes and assessments and other charges and expenses payable by Seller, shall be prorated as of the Closing Date on the basis of the actual number of days of the month that have elapsed as of the Closing Date and based upon a three hundred sixty five (365) day year. With respect to prorations related to real property taxes and assessments, the basis for said proration shall be the amount shown for real property taxes and assessments in the most recent installment for the fiscal year in which the Closing Date occurs. If no installment for the fiscal year in which Closing Date occurs is available, Buyer and Seller shall reasonably estimate such installment which shall be used to prorate taxes and assessments. No adjustment shall be made for any change in the real property taxes and assessments occurring by virtue of the sale of the Property to Buyer. The amount of such prorations shall be subject to adjustment in cash as and when complete and accurate information becomes available, if such information is not available on the Closing Date. Seller and Buyer agree to cooperate and use their best efforts to make such adjustments prior to forty-five (45) days after the Closing Date.

11.1    <u>Bookings</u>.    Buyer shall receive a credit for all prepaid deposits and advance payments for bookings scheduled to occur on or after the Closing Date, including deposits forfeited prior to the Closing Date for reservations to take place from or after the Closing Date; travel agents' commissions, if any, shall be apportioned consistent with the allocation of Hotel room revenues referable to each such travel agent.

11.2    <u>Vending Machines</u>. As and to the extent applicable,  Seller shall remove all monies from all vending machines, laundry machines, pay telephones and other coin-operated equipment as of the Closing Date and shall retain all monies collected therefrom as of the Closing Date, and Buyer shall be entitled to any monies collected therefrom after the Closing Date.

11.3    <u>Gift Certificates</u>.  Seller shall give Buyer a credit at Closing for any gift certificates or similar items which allow a person to use the hotel's room and facilities after Closing at no cost or at a discounted price except that there shall be no proration or credit for discounts offered in the ordinary course of business as part of promotions by the hotel. Within ten (10) days after the Closing Date, Seller shall provide Buyer with a schedule of any and all outstanding gift certificates or similar items.

11.4    <u>Guest Ledgers</u>. All amounts in the Guest Ledger (including charges for rooms, food, beverage, telephone charges and otherwise) accruing prior to the Closing Date, shall be credited to Buyer (in the amount thereof), and all amounts in the Guest Ledger accruing after the Closing Date shall belong to Buyer. The entire Guest Ledger shall thereupon become the property of Buyer. "**Guest Ledger**" shall mean any accounts of registered guests of the hotel who have not checked out as of the Closing Date. All amounts in the City Ledger accruing prior to the Closing Date become the property of Buyer upon the occurrence of the Closing hereunder. "**City Ledger**" shall mean all accounts receivable of non-registered guests and/or patrons of the hotel who have received hotel services but not yet paid their bills

11.5    <u>Guests' Baggage</u>. On the Closing Date, authorized representatives of Buyer and Seller shall take inventory of and tag (a) all baggage, suitcases, luggage, valises and trunks of hotel guests checked or left in the care of Seller, (b) all luggage or other property of guests retained by Seller as security for unpaid accounts receivable, and (c) the contents of any storage room; <u>provided</u>, <u>however</u>, that no such baggage, suitcases, luggage, valises or trunks shall be opened. All such baggage and other items shall be sealed and listed in an inventory prepared and signed jointly by the representatives of Buyer and Seller as of the Closing Date, and any such items shall be the responsibility of Buyer from and after such date, and Buyer agrees to indemnify and hold Seller, harmless from and against any and all claims, demands, suits, liability or judgments, including costs and reasonable attorney's fees, in connection therewith or arising from and after the Closing Date. The provisions of this Section 11.1.5 shall survive the Closing.

11.6    <u>Guests' Safe Deposits</u>. Immediately after the Closing, Seller shall send written notice to guests or tenants or other persons who have safe deposit boxes that are located in the hotel, advising of the sale of the hotel to Buyer and requesting immediate removal of the contents thereof or the removal thereof and concurrent re-deposit of such contents pursuant to new safe deposit agreements with Buyer within two (2) calendar days after the Closing Date. All such removals and verifications shall be under the supervision and control of one representative each of Seller and Buyer. Safe deposit boxes of guests who have not responded to such written notice by so removing and verifying the contents thereof shall be removed by Buyer in the presence of a representative of Seller, and listed on a separate sheet and verified and signed jointly by the representatives of Buyer and Seller effective as of the Closing Date (the "**Unclaimed Safe Contents List**").  Buyer shall be solely responsible from and after the Closing Date for the verified contents of all such boxes that are on the Unclaimed Safe Contents List, and Buyer hereby agrees to indemnify and hold Seller harmless from and against any and all claims, demands, suits, liability or judgments, including costs and reasonable attorneys' fees, in connection therewith arising from and after the Closing Date. The provisions of this Section 11.1.6 shall survive the Closing

11.7    Other Adjustments and Prorations. All other items of income and expense as are customarily adjusted or prorated upon the sale and purchase of property similar to the Property shall be adjusted and prorated between Seller and Buyer accordingly.

11.8    Consumables and Inventories. Seller shall prepare, as of the Effective Date , an inventory of the Consumables and Inventories, all of which shall be maintained at normal and customary levels prior to Closing (the "Closing Inventory"). At the Closing, Seller shall receive a credit (at cost) for the Closing Inventory in unopened carton at the Property.

11.9    Income Taxes. Seller shall be responsible for and shall indemnify and hold Buyer harmless from any federal or local income, franchise, or other tax liability relating to Seller, and to the Property for periods up to the Closing Date including accounts for which Seller receives an adjustment to the Purchase Price. Buyer shall be responsible for and shall indemnify and hold Seller harmless from any sales taxes and any other federal or local income, franchise, or other tax liability for periods after the Closing Date.

12.    Representations and Warranties.

12.1    Representations and Warranties of Seller. Seller hereby makes the following representations and warranties, which representations are true in all respects as of the date hereof and shall be true in all respects on the Closing Date:

12.1.1    Organization. Seller is duly organized, validly existing and in good standing under the laws of the State of New York. Subject to the applicable provisions of bankruptcy law, the Plan and the Confirmation Order, Seller has all requisite corporate or limited liability company power and authority to own its properties and assets and to conduct its businesses as now conducted.

12.1.2    Authorization and Validity. Subject to the applicable provisions of bankruptcy law, the Plan and the Confirmation Order, Seller, by and through the Trust, has all requisite corporate or limited liability company power and authority to enter into this Agreement and any Ancillary Agreements to which Seller is or will become a party and, subject to the (i) Bankruptcy Court's entry of the Sale Approval Order, and (ii) receipt of all Consents to perform Seller's obligations hereunder and thereunder, the execution and delivery of this Agreement and each ancillary agreement to which Seller is or will become a party and the performance of Seller's obligations hereunder and thereunder, have been, or on the Closing Date will be, duly authorized by all necessary corporate or limited liability company action of Seller, and no other corporate or limited liability company proceedings on the part of Seller are necessary to authorize such execution, delivery and performance. Subject to the applicable provisions of bankruptcy law, the Plan and the Confirmation Order, this Agreement and each ancillary agreement to which Seller is or will become a party have been, or on the Closing Date will be, duly executed by Seller, and, subject to the Bankruptcy Court's entry of the Sale Approval Order, constitute, or will when executed and delivered constitute, Seller's valid and binding obligation, enforceable against Seller in accordance with their respective terms.

12.1.3    <u>No Conflict</u>. Subject to the applicable provisions of bankruptcy law, the Plan and the Confirmation Order, and (i) receipt of all consents and (ii) the Bankruptcy Court's entry of the Sale Approval Order, the execution, delivery and performance by Seller of this Agreement and each ancillary agreement to which any of them is or will become a party does not and will not (A) violate or conflict with any provision of the organizational documents (<u>i.e.</u>, certificate of incorporation, certificate of formation, bylaws, member control agreement or operating agreement) of Seller, (B) violate any provision of law, or any order, judgment or decree of any government authority applicable to Seller, (C) result in or require the creation or imposition of any liens (other than Permitted Exceptions), claims, interests, and encumbrances on the Property or (D) violate or result in a breach of or constitute (with due notice or lapse of time or both) a default under any Assumed Contract entered into by Seller or by which the Seller is bound or to which the assets of Seller is subject.

12.1.4    <u>Litigation</u>. There are no actions, claims, suits, investigations, arbitrations or other proceedings pending, or, to the knowledge of Seller, threatened, against Seller or the Property. There are no outstanding violations of law or, to the knowledge of Seller, any outstanding order of any governmental authority with respect to Seller or the Property. Except as set forth on <u>Schedule 12.1.4</u>, there are no outstanding, nor to the knowledge of Seller any threatened, disputes or disagreements with respect to any agreements, contracts or other arrangements made in connection with the Property.

12.1.5    <u>Permits</u>. <u>Schedule 12.1.5</u> sets forth a true, correct and complete list of all material permits in connection with the Property, and all pending applications therefore held by Seller. <u>Schedule 12.1.5</u> lists the current zoning/permitting status for the Property. Except as set forth on <u>Schedule 12.1.5</u>, each such permit has been duly obtained, is valid and in full force and effect, and is not subject to any pending or, to the knowledge of Seller, threatened administrative or judicial proceeding to revoke, cancel, suspend or declare such permit invalid in any respect.

12.1.6    <u>Environmental Matters</u>. <u>Schedule 12.1.6</u> is a list of all environmental reports in possession of Seller (collectively, the "<u>Environmental Reports</u>"), and true and correct copies of the Environmental Reports have been delivered to Buyer. To the knowledge of Seller, except as set forth in the Environmental Reports, all operations or activities at, on, in, under or about, or use or occupancy of, the Property, or any portion thereof, is, and at all times while owned or leased by Seller has been, in compliance with all Environmental Laws and the requirements and recommendations set forth in the Environmental Reports, and, Seller, nor to the knowledge of Seller, any prior owner or prior or current tenant or occupant of the Property, or any portion thereof, engaged in or permitted any handling, manufacture, treatment, storage, use, generation, release, discharge, refining, dumping or disposal of any Hazardous Materials on, under, in or about the Property or any portion thereof, except in compliance with all Environmental Laws. Except as disclosed in an Environmental Report, to the knowledge of Seller there is not present at, on, in or under the Property, or any portion thereof, except in compliance with Environmental Laws, any Hazardous Materials, underground storage tanks, asbestos, or any structures, fixtures, equipment or other objects or materials containing Hazardous Materials, and to the knowledge of Seller there has been no violation of Environmental Laws relating to the Property which remains uncured. "<u>Hazardous Materials</u>" means any chemical, substance, pollutant, contaminant, materials or wastes, whether solid, liquid

or gaseous in nature, which may pose a threat to human health or to the environment, including without implied limitation all "hazardous matter," "hazardous materials," "hazardous substances," "oil," "asbestos," "asbestos-containing materials," "polychlorinated biphenyls," "lead paint," "radon gas," "petroleum products," "urea-formaldehyde," "high-level radioactive waste," "low-level radioactive waste," "spent nuclear fuel," material which emits "radiation" and/or is radioactive, and/or "solid waste" as defined or used in any applicable Environmental Laws.

12.1.7   Real Property Leases. Schedule 12.1.7 sets forth a correct and complete list of each real property lease (collectively, "Real Property Leases"), and the following information with respect to each of the Real Property Leases: the date of the lease and a list of all amendments thereto, the name and current address of the tenant, the commencement date, the term, current base rent and additional rent and amount of security deposit being held by the Seller (the "Lease Schedule"). Except for the Real Property Leases, there are no other leases, licenses or other agreements affecting Seller's ownership of the Property.  With respect to each Real Property Lease: (i) the Real Property Lease is in full force and effect, and constitutes the valid and binding legal obligation of the applicable tenant, enforceable against it in accordance with its terms; (ii) there are no understandings, oral or written, between the parties to such Real Property Lease which in any manner vary the obligations or rights of either party; (iii) except as indicated on the Lease Schedule, no tenant is in default under such Real Property Lease, and, to the knowledge of Seller, no controversy, claim, dispute or disagreement exists between the parties to any Real Property Lease and, to the knowledge of Seller, no event has occurred which with the passage of time or giving of notice, or both, would constitute a default thereunder; and (iv) there are no unpaid tenant improvement allowances with respect to any Real Property Lease. True, complete and accurate copies of each Real Property Lease have been delivered or made available to Buyer.  Seller has not assigned its interest under any Real Property Lease to which it is a party, or subleased, licensed, encumbered or pledged all or any portion of its leasehold interest in any Real Property Lease, to any third party.  No option has been exercised under any Real Property Lease, except options whose exercise has been evidenced by a written document delivered to Buyer.  All brokerage commissions and other similar compensation and fees payable in connection with the Real Property Leases have been paid in full and no additional brokerage commissions or other similar compensation and fees may be due in the future.

12.1.8   Brokerage and Finder's Fees.  Except as concerns any commission due to Savills, Inc., Seller, and none of Seller's affiliates or any of the officers or directors of Seller or any affiliate of Seller, has any liability or obligation to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement.

12.1.9   Title.  Upon approval of the Bankruptcy Court, at the Closing, Buyer will acquire all of Seller's right, title and interest in and to all the Property, free and clear of any liens, claims or encumbrances, as provided in the Approval Order.

12.1.10   Taxes. Except as set forth on Schedule 12.1.10, to the knowledge of  the Seller, (i) Seller has timely filed all tax returns required to be filed with the appropriate tax authorities, and all such tax returns are correct and complete in all respects; (ii) except as to taxes the payment of which is prohibited or stayed by the Bankruptcy Code, Seller has paid all taxes

due and payable by it (whether or not such taxes are shown on any tax return); (iii) Seller has withheld and paid all taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party; (iv) Seller has received any written notice of deficiency or assessment from any tax authority with respect to liabilities for taxes of Seller which have not been fully paid or finally settled; (v) Seller has waived any statute of limitations in respect of taxes or agreed to any extension of time with respect to a tax assessment or deficiency; (vi) no tax audit, examination or other proceeding regarding taxes is in progress or threatened in writing, with respect to Seller; and (vii) no written claim has ever been made by a tax authority in a jurisdiction where the Seller does not file tax returns that Seller is or may be subject to taxation by that jurisdiction.

12.1.11  <u>Prior Rights with respect to Property</u>.  Except as disclosed on <u>Schedule 12.1.11</u>, there are no options or right of first refusal, or any other rights, to acquire any interest in the Property, or any portion thereof.

12.1.12  <u>Use and Operation of Property/Restrictions & Easements</u>.  Except as otherwise specifically set forth in this Agreement, Seller does not know of any fact, nor has Seller failed to disclose any fact which would prevent Buyer from using and operating the Property as currently operated by Seller. To the knowledge of Seller, the current use and occupancy of the Property does not violate any easement, covenant, condition, restriction or similar provision in any instrument of record or other unrecorded agreement or restriction affecting the Property or any laws..

12.1.13  <u>Eminent Domain</u>.  There is no existing, nor, to the knowledge of Seller, any proposed or threatened, eminent domain or similar proceeding, or private purchase in lieu of such a proceeding, which would materially adversely affect the Property.

12.1.14  <u>Disclosure</u>.  No representation or warranty of the Seller contained in this Agreement or any ancillary agreement, and no statement, report, or certificate furnished by or on behalf of the Seller to the Buyer or its agents pursuant to this Agreement or any of the other documents, contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary in order to make the statements contained herein or therein, in the aggregate, not misleading or omits or will omit to state a material fact necessary in order to provide the Buyer with full and proper information as to the Property.

12.1.15  Seller is not a party to any management agreement with respect to the Property, except for that Hotel Consulting and Management Agreement by and between Madison Hotel LLC and Tecton Madison 28 Management Services, LLC, dated July 9, 2008 (the "<u>Management Agreement</u>").  Seller represents and warrants that the Management Agreement will be terminated, effective on the Closing Date.

12.1.16  With respect to "Anti-Money Laundering and Anti-Terrorism Laws" (as defined below):

(1)    Seller or, to Seller's Knowledge. Seller's affiliates (including, without limitation, Company), are not in violation of any laws relating to terrorism, money laundering or the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept

and Obstruct Terrorism Action of 2001, Public Law 107-56 and/or the Executive Order referred to below (the "Anti-Money Laundering and Anti-Terrorism Laws").

(2)    Seller or, to Seller's and Knowledge, Seller's affiliates (including, without limitation, Company), are not acting, directly or indirectly, on behalf of terrorists, terrorist organizations or narcotics traffickers, including those persons or entities that appear on the Annex to the Executive Order No. 13224 (Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism) (such Executive Order, the "Executive order"), or are included on any relevant lists maintained by the Office of Foreign Asset Control of U.S. Department of Treasury, U.S. Department of State, or other U.S. government agencies, all as may be amended form time to time.

(3)    Seller or, to Seller's Knowledge, Seller's affiliates (including, without limitation, Company), in any capacity in connection with the ownership of the Purchased Interest or the operation of the Property does not (1) conduct any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any person included in the lists set forth in the preceding paragraph; (2) deal in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order; or (3) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Money Laundering and Anti-Terrorism Laws.

(4)    Neither Seller, nor any person controlling or controlled by it (including, without limitation, Company), is a country, territory, individual or entity named on any of (i) the two lists maintained by the United States Department of Commerce (Denied Persons and Entities), (ii) the list maintained by the United States Department of Treasury (Specially Designed Nationals and Blocked Persons), and (iii) the two lists maintained by the United States Department of State (Terrorist Organizations and Debarred Parties) (any such list, a "Government List"), and the monies used in connection with this Agreement and amounts committed with respect thereto, were not and are not derived from any activities that contravene any applicable anti-money laundering or anti-bribery laws and regulations (including funds being derived from any person, entity, country or territory on a Government List or engaged in any unlawful activity defined under Title 18 of the United States Code, Section 1956(c)(7)).

12.1.17  Except as identified on Schedule 1.7, there are no service, maintenance, telecommunications or other contracts (excluding Real Property Leases) in connection with the Property.

12.1.18.  As of the Effective Date and the Closing, (i) no Hazardous Materials have been used, manufactured, generated, sold, handled, treated, transported, stored or disposed of by the Seller or, to Seller's Knowledge, any predecessor at the Property; (ii) no Hazardous Materials have spilled, discharged, released, emitted, injected or leaked from, in, on, or migrated to or from the Property; (iii) the Property has been maintained in compliance with applicable Environmental Laws during Seller's ownership of the Property; (iv) the Property is not subject to any environmental lien; (v) Seller has provided Buyer with copies of all reports, audits, studies or analyses of any kind whatsoever in its possession, custody or control of the Seller relating to Hazardous Materials at or in connection the Property; (vi) Seller has not received any written

notice, demand, letter, claim or request for information regarding the presence of Hazardous Materials or liability under any Environmental Law with respect to the Property; and (vii) Seller has not received any written notice (the subject of which has not been fully cured) that the Property is currently subject to any orders, decrees, injunctions or any other proceedings or requirements imposed by any governmental authority or third party pursuant to any Environmental Law.   The term "Hazardous Materials" means (a) those substances included within the definitions of any one or more of the terms "hazardous materials," "hazardous wastes," "hazardous substances," "industrial wastes," and "toxic pollutants," as such terms are defined under the Environmental Laws, or any of them, (b) petroleum and petroleum products, including, without limitation, crude oil and any fractions thereof, (c) natural gas, synthetic gas and any mixtures thereof, (d) asbestos and or any material which contains any hydrated mineral silicate, including, without limitation, chrysotile, amosite, crocidolite, tremolite, anthophylite and/or actinolite, whether friable or non-friable (collectively, "Asbestos"), (e) polychlorinated biphenyl ("PCBs") or PCB-containing materials or fluids, (f) radon, (g) mold, (h) any other hazardous or radioactive substance, material, pollutant, contaminant or waste, and (i) any other substance with respect to which any Environmental Law or governmental authority requires environmental investigation, monitoring or remediation; provided, that Hazardous Materials shall not include items used in the ordinary course of business by Seller, or any tenant of the Property with respect the operation, maintenance, repair or cleaning of the Property.   The term "Environmental Laws" means all federal, state and local laws, statutes, ordinances and regulations, now or hereafter in effect, in each case as amended or supplemented from time to time, including, without limitation, all applicable judicial or administrative orders, applicable consent decrees and binding judgments relating to the regulation and protection of human health, safety, the environment and natural resources (including, without limitation, ambient air, surface, water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation), including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §§ 9601 et seq.), the Hazardous Material Transportation Act, as amended (49 U.S.C. §§ 1801 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 U.S.C. §§ 136 et seq.), the Resource Conservation and Recovery Act, as amended (42 U.S. §§ 6901 et seq.), the Toxic Substance Control Act, as amended (15 U.S.C. §§ 2601 et seq.), the Clean Air Act, as amended (42 U.S.C. §§ 7401 et seq.), the Federal Water Pollution Control Act, as amended (33 U.S.C. §§ 1251 et seq.), the Occupational Safety and Health Act, as amended (29 U.S.C. §§ 651 et seq.), the Safe Drinking Water Act, as amended (42 U.S.C. §§ 300f et seq.), Environmental Protection Agency regulations pertaining to Asbestos (including, without limitation, 40 C.F.R. Part 61, Subpart M, the United States Environmental Protection Agency Guidelines on Mold Remediation in Schools and Commercial Buildings, the United States Occupational Safety and Health Administration regulations pertaining to Asbestos including, without limitation, 29 C.F.R. Sections 1910.1001 and 1926.58), applicable New York State and New York City statutes and the rules and regulations promulgated pursuant thereto regulating the storage, use and disposal of Hazardous Materials, the New York City Department of Health Guidelines on Assessment and Remediation of Fungi in Indoor Environments and any state or local counterpart or equivalent of any of the foregoing, and any federal, state or local transfer of ownership notification or approval statutes.

12.1.19   The Seller shall have paid federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, occupation, customs, ad valorem, duties, franchise, withholding, social security, unemployment, real property, personal property, sales,

use, transfer, registration, estimated or other tax of any kind whatsoever, including any interest, penalty or addition thereto, whether disputed or not, including such taxes relating to any period prior to the Effective Date and the Closing Date, respectively.

12.1.20  Seller has no Plans (as that term is defined in Section 3(3) of Employee Retirement Income Security Act of 1974, as amended from time to time), of which Seller or Company is a sponsor or to which it contributes or has contributed or in which it otherwise participates or has participated.

12.1.21  Purchaser shall continue to have reasonable access from the date hereof to the Closing Date to inspect the Property and all of Seller's books and records at reasonable times and on reasonable notice.

The representations and warranties of Seller to Buyer contained in this Section 12.1 hereof, shall not survive the Closing and the delivery of the Deed and Assignment.

12.2    Buyer's Representations and Warranties.    As a material inducement to Seller's decision to enter into this Agreement, Buyer represents and warrants to Seller the following, which shall be true and correct on the Effective Date and on the Closing Date:

12.2.1  Due Authorization.    The execution, delivery and performance of this Agreement by Buyer have been duly authorized by the requisite action on the part of Buyer, and no other authorization or consent is required therefor.

12.2.2  Violation of Agreements.    To Buyer's knowledge, neither this Agreement nor anything provided to be done hereunder, including but not limited to, the transfer, assumption and purchase of the Property, violates or shall violate any contract, agreement or instrument to which Buyer is a party.

12.2.3  Full Disclosure.    Neither this Agreement nor any certificate, statement or other document prepared by Buyer and furnished to Seller by Buyer in connection with the transactions contemplated herein contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary in order to make the statements contained herein or therein not misleading.

13.    Further Assurances; Development Cooperation. Seller will, whenever and as often as it shall be requested to do so by Buyer, and Buyer will, whenever and as often as it shall be requested to do so by Seller, execute, acknowledge and deliver, or cause to be executed, acknowledged or delivered, any and all such further conveyances, assignments, confirmations, satisfactions, releases, instruments of further assurance, approvals, consents, and any and all such further instruments and documents as may be reasonably necessary, expedient or proper in order to complete any and all conveyances, transfers, sales and assignments herein provided, and to do any and all other acts and to execute, acknowledge and deliver any and all documents as so reasonably requested in order to carry out the intent and purpose of this Agreement.

14.    Possession.    Exclusive possession of the Land and Property shall be delivered to Buyer on the Closing Date.

15.    Indemnification.

15.1    Indemnity.  Buyer shall indemnify, defend and hold Seller Parties (as defined herein), harmless from all losses, costs, expenses (including, without limitation, reasonable attorneys' fees, costs and expenses), liabilities, damages, claims, causes of action and other obligations whatsoever arising out of, resulting from, or related in any manner to: (i) claims of mechanics and materialmen based on work performed on or contracted for the Land and/or Property by Buyer; and (ii) claims for personal injury, wrongful death, property damage or other tort claims against Seller Parties based on Buyer's act or omission and/or third party causes of action against Buyer arising subsequent to the Effective Date to the extent same result from Buyer's activities.

15.2    Indemnification Procedure. If any of the Seller Parties (the "**Indemnitee**") is entitled to defense or indemnification under this Article 15 or any other express provision in this Agreement (each, an "**Indemnification Claim**"), Buyer shall not be obligated to indemnify and hold harmless such Indemnitee unless and until such Indemnitee provides written notice to Buyer promptly after such Indemnitee has actual knowledge of any facts or circumstances on which such Indemnification Claim is based (the "**Third-Party Claim**"), describing in reasonable detail such facts and circumstances and including copies of all notices and documents (including court papers) received by the Indemnitee in connection therewith.  The Indemnitor shall have the right (but not the obligation) to assume the defense of a Third-Party Claim, at its cost and expense, and shall use good faith efforts consistent with prudent business judgment to defend a Third-Party Claim, provided that (i) the counsel for the Indemnitor who shall conduct the defense of the Third-Party Claim shall be reasonably satisfactory to the Indemnitee (unless selected by Indemnitor's insurance company), (ii) the Indemnitee, at its cost and expense, may participate in, but shall not control, the defense of the Third-Party Claim, and (iii) the Indemnitor shall not enter into any settlement or other agreement which requires any performance by the Indemnitee, other than the payment of money to be paid by the Indemnitor. If the Indemnitor has assumed the defense of the Third-Party Claim as set forth above, the Indemnitee shall not enter into any settlement agreement with respect to the Third-Party Claim, without the Indemnitor's prior written consent, which consent may be withheld in Indemnitor's sole reasonable discretion.  If the Indemnitor elects not to assume the defense of the Third-Party Claim, the Indemnitee shall have the right to retain the defense of the Third-Party Claim at the Indemnitor's expense, and may defend and/or settle the Third-Party Claim as it deems reasonably appropriate.

16.    Damage, Destruction or Condemnation.  If, before the Closing Date, all or any material portion (meaning any portion that adversely affects access to, visibility of, or any improvements or parking on, the Land or Property or that consists of more than ten percent (10%) of the Land) of the Land or Property is subject to an actual or threatened taking by a public authority, by the power of eminent domain or otherwise, or is destroyed or materially damaged (material damage shall be that which would cost $125,000 or more to repair, as reasonably determined by Buyer), Buyer shall have the right, exercisable by giving written notice to Seller within fifteen (15) days after Buyer's receipt of written notice from Seller of such taking and the determination of the amount of any related award, or receipt of written notice from Seller of such destruction or material damage, as the case may be, either (a) to terminate its

obligation to purchase the Property, in which case Buyer's obligation to purchase, and Seller's obligation to sell, the Property shall terminate, and neither Party shall have any further obligation to the other except as otherwise provided in this Agreement and the Earnest Money shall be refunded to Buyer, or (b) to accept the applicable portion of the Land and/or Property in its then existing condition, in which case, all proceeds of insurance and/or condemnation awards, as the case may be, payable to Seller by reason of such damage, destruction or condemnation shall be paid or assigned to Buyer.  If Buyer elects to proceed under clause (b) above, Seller shall not compromise, settle or adjust any claims to such proceeds of insurance and/or condemnation and any deductible in Seller's insurance policy award without Buyer's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.  Buyer's failure to deliver such notice within the time period specified shall be deemed to constitute Buyer's election to accept the Land and/or Property in its then condition and proceed with the closing in accordance with this Agreement.

17.    <u>Buyer Default; Liquidated Damages</u>. BUYER AND SELLER ACKNOWLEDGE AND AGREE THAT, WITH THE FLUCTUATION IN LAND VALUES, THE UNPREDICTABLE STATE OF THE ECONOMY AND OF GOVERNMENT REGULATIONS, THE FLUCTUATING MONEY MARKET FOR REAL ESTATE LOANS OF ALL TYPES, AND OTHER FACTORS THAT DIRECTLY AFFECT THE VALUE AND MARKETABILITY OF THE PROPERTY, IT WOULD BE EXTREMELY DIFFICULT AND IMPRACTICABLE TO ASCERTAIN WITH ANY DEGREE OF CERTAINTY THE AMOUNT OF DAMAGES THAT WOULD BE SUFFERED BY SELLER IN THE EVENT OF THE FAILURE OF THE TRANSACTION WHICH IS THE SUBJECT OF THIS AGREEMENT TO CLOSE AS A RESULT OF BUYER'S DEFAULT IN ITS OBLIGATION UNDER THIS AGREEMENT TO PURCHASE THE PROPERTY.  THE PARTIES, HAVING MADE DILIGENT BUT UNSUCCESSFUL ATTEMPTS TO ASCERTAIN THE ACTUAL COMPENSATORY DAMAGES SELLER WOULD SUFFER IN THE EVENT OF BUYER'S DEFAULT OF ITS OBLIGATION HEREUNDER TO PURCHASE THE PROPERTY, HEREBY AGREE THAT THE REASONABLE ESTIMATE OF SAID DAMAGES IS THE EARNEST MONEY REQUIRED TO BE ON DEPOSIT WITH THE ESCROW AGENT AT THE TIME OF BUYER'S DEFAULT AS PROVIDED IN SECTION 2.1.1 HEREOF.  SUCH AMOUNT HAS BEEN DETERMINED WITH REFERENCE BY THE PARTIES TO THE ABOVE CONSIDERATIONS IN ESTABLISHING A REASONABLE SUM AS LIQUIDATED DAMAGES.  THE FOREGOING CONTAINED IN THIS PARAGRAPH 17 DOES NOT LIMIT BUYER'S LIABILITY UNDER ANY INDEMNITY OR OTHER PROVISION OF THIS AGREEMENT THAT BY ITS TERMS SURVIVES A TERMINATION OF THIS AGREEMENT OR IS TO BE PERFORMED AFTER THE CLOSING.

Initials: _____    _____
                    Seller                      Buyer

18.    <u>Seller's Breach</u>.  In the event Seller materially breaches any representation, warranty or covenant under this Agreement or any agreement, certificate, or other obligation in connection therewith (collectively a "**Default**"), and the closing under this Agreement fails to occur because of such Default, Buyer may elect to: (a) if applicable, pursue the equitable remedy of specific performance, and/or (b) terminate its obligation to purchase the Property and cancel

this Agreement by giving Seller written notice describing Seller's Default and setting forth Buyer's election to immediately terminate its obligation to purchase the Property and cancel the transaction contemplated by this Agreement and receive a return of the Earnest Money. The foregoing contained in this Paragraph 18 does not limit Seller's liability under any provision of this Agreement that by its terms survives a termination of this Agreement.

19.   Broker.  Buyer and Seller each acknowledge that Savills, Inc. (the "**Broker**") has been engaged in connection with the transactions contemplated by this Agreement. In the event of any claim for broker's, consultant's or finder's fees or commissions in connection with the negotiation, execution or consummation of this Agreement by any party other than Broker, then Buyer shall indemnify, save harmless and defend Seller from and against such claim if it shall be based upon any statement, representation or agreement made by Buyer, and Seller shall indemnify, save harmless and defend Buyer from and against such claim if it shall be based upon any statement, representation or agreement made by Seller.  Seller shall pay Broker pursuant to a separately negotiated agreement.

20.   Notices.  Any notice, request, demand, instruction or other document (each of which is herein called a "**Notice**") to be given hereunder to any Party shall be in writing and shall be delivered to the person at the appropriate address set forth below by personal service (including courier service), by electronic communication, whether by facsimile or electronic mail, by certified mail, postage prepaid, return receipt requested, or by overnight delivery by a nationally-recognized overnight courier, as follows:

If to Seller, to:

> Grant Lyon
> Odyssey Capital
> 1120 Avenue of the Americas
> Fourth Floor
> New York, New York 10036

With a copy to:

> Seth Van Aalten
> Cooley LLP
> 1114 Avenue of the Americas
> New York, New York 10036

If to Buyer, to:

> Assa Properties Inc.
> 410 Park Avenue
> New York, New York 10022

With a copy to:

        Mitch Fenton, Esq.
        Wachtel Missry LLP
        885 Second Avenue
        New York, New York 10017

Notices so submitted shall be deemed to have been given (i) on the date personally served, if by personal service, (ii) on the date of confirmed dispatch, if by electronic communication, (iii) intentionally omitted or (iv) the next business day to the extent delivered by overnight delivery by a nationally-recognized overnight courier. The addresses for the purpose of this Paragraph, may be changed by giving written notice of such change in the manner herein provided for giving notice. Unless and until such written Notice of change is received, the last address and addressee stated by written Notice, or provided herein if no such written Notice of change has been received, shall be deemed to continue in effect for all purposes hereunder.

21.    **Miscellaneous Provisions.**

    21.1   <u>No Waiver</u>. The waiver by one Party of the performance of any covenant, condition or promise shall not invalidate this Agreement nor shall it be considered a waiver by such Party of any other covenant, condition or promise hereunder. The waiver by either or both Parties of the time for performing any act shall not constitute a waiver of the time for performing any other act or identical act required to be performed at a later time. The exercise of any remedy provided by law and the provisions of this Agreement for any remedy shall not exclude other consistent remedies unless they are expressly excluded.

    21.2   <u>Construction</u>. As used in this Agreement, the masculine, feminine or neuter gender and the singular or plural numbers shall each be deemed to include the other whenever the context indicates. This Agreement shall be construed as a whole and in accordance with its fair meaning, the captions being for convenience only and not intended to fully describe or define the provisions in the portions of the Agreement to which they pertain. Each Party hereto, and counsel for each Party hereto, has reviewed and revised this Agreement, and the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting Party shall not be employed in the interpretation or construction of this Agreement. This document shall, in all respects, be governed by the laws of the State of New York applicable to agreements executed and to be wholly performed within the State of New York. Nothing contained herein shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provision contained herein and any present or future statute, law, ordinance or regulation contrary to which the Parties have no legal right to contract, the latter shall prevail but the provision of this document that is affected shall be curtailed and limited only to the extent necessary to bring it within the requirements of the law.

    21.3   <u>Merger/AS IS, WHERE IS</u>.   All understandings and agreements heretofore had between the parties hereto are merged in this Agreement, which alone fully and completely expresses their understanding and agreement. Except as otherwise provided in this

Agreement, this Agreement is entered into after full investigation, neither party relying upon any statement or representation, not embodied in this Agreement, made by the other.

Buyer acknowledges and agrees that Seller shall convey to Buyer and Buyer shall accept the Property **"AS IS, WHERE IS, WITH ALL FAULTS"**. Buyer has not relied and will not rely on, and Seller is not liable for or bound by, any express or implied warranties, guarantees, statements, representations or information pertaining to the Property or relating thereto made or furnished by Seller or any real estate broker or agent representing or purporting to represent Seller, to whomever made or given, directly or indirectly, orally or in writing, unless specifically set forth in this Agreement.

Buyer confirms to the Seller that Buyer, acting directly or through its qualified representatives, will conduct such investigations of the Property, including but not limited to, the physical and environmental conditions and land use characteristics thereof and its suitability for Buyer's intended use thereof, as Buyer deems reasonably necessary or desirable and when it has reached a favorable conclusion as to the condition of the Property and the existence or nonexistence with respect to any Hazardous Materials, and will rely solely upon such investigations, with which it shall be satisfied fully and in all respects and not upon any information, if any, provided by or on behalf of Seller or its agents or employees with respect thereto. Buyer agrees that upon closing, Buyer shall assume the risk that adverse matters, including but not limited to, construction defects, title and adverse physical and environmental conditions, may not have been revealed by Buyer's investigations or that of its representatives, and that Buyer, upon closing, shall be deemed to have waived, relinquished and released Seller Parties from and against any and all claims, demands, causes of action (including causes of action in tort), losses, damages, liabilities, costs and expenses (including reasonable attorneys' fees) of any and every kind or character, known or unknown, which Buyer might have asserted or alleged against Seller at any time by reason of or arising out of any latent or patent construction defects or physical conditions, violations of laws and any and all other acts, omissions, events, circumstances or matters regarding the Property. Buyer further acknowledges that it has satisfied itself, after consultation with counsel as to the nature and state of title of the Property it will obtain from Seller and is satisfied with such title. Moreover, Buyer has reached a satisfactory determination as to value of the Property.

**WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PROPERTY.**

21.4    <u>Amendments</u>. No change in or addition to this Agreement or any part hereof shall be valid unless in writing and signed by or on behalf of the Party charged therewith.

21.5    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts. Each such counterpart hereof shall be deemed to be an original instrument but all such counterparts together shall constitute but one agreement. Execution of counterparts of this Agreement may be by facsimile or electronic mail transmission. Executed counterparts of this Agreement bearing only the facsimile or electronic mail signatures of the Parties' duly

authorized representatives shall be effective and binding on such Parties as though they bore original signatures.

21.6  Survival.  All covenants and agreements made herein shall survive the execution and delivery of this Agreement, the recording of the Deed and Assignment and all deliveries contemplated herein.

21.7  Computation of Periods.  All periods of time referred to in this Agreement shall include all Saturdays, Sundays and State or National holidays, unless the period of time specifies "**business days**", in which case such period of time shall exclude Saturdays, Sundays and State and National holidays; provided that if the date or last date to perform any act or give any notice with respect to this Agreement shall fall on a Saturday, Sunday or State or National holiday, such act or notice may be timely performed or given on the next succeeding day that is not a Saturday, Sunday or State or National holiday.  For purposes of this Agreement, the phrase "**State and National holiday**" shall refer to any day in which the Title Company and/or the Office of the County Recorder for the County for the Property is/are closed for business.

21.8  INDEPENDENT COUNSEL.  EACH PARTY TO THIS AGREEMENT ADMITS, ACKNOWLEDGES AND REPRESENTS THAT IT HAS HAD THE OPPORTUNITY TO CONSULT WITH AND BE REPRESENTED BY INDEPENDENT COUNSEL OF SUCH PARTIES' CHOICE IN CONNECTION WITH THE NEGOTIATION, EXECUTION AND AMENDMENT OF THIS AGREEMENT. EACH PARTY FURTHER ADMITS, ACKNOWLEDGES AND REPRESENTS THAT IT HAS NOT RELIED ON ANY REPRESENTATION OR STATEMENT MADE BY ANY OF THE ATTORNEYS AND REPRESENTATIVES OF THE OTHER PARTY WITH REGARD TO THE SUBJECT MATTER, BASIS, OR EFFECT OF THIS AGREEMENT.

21.9  Assignment by Buyer.  Buyer shall be authorized sole and absolute discretion to assign this Agreement and any of its rights, duties or obligations hereunder without the prior written consent of Seller; provided, however, that Buyer shall provide written notice of such assignment to Seller not later than ten (10) business days following the effectiveness of any such assignment. Upon an assignment by Buyer, such assignee shall assume all of the original Buyer's rights, duties and obligations hereunder, all references in this Agreement to "Buyer" shall refer to such assignee and the original Buyer shall thereupon be released from any and all liability under this Agreement and shall have no further rights under this Agreement.

21.10  Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the successors and assigns of Seller and Buyer.

21.11  No Obligation to Third Parties.  Except as expressly set forth in this Agreement, the execution and delivery of this Agreement shall not be deemed to confer any rights upon, nor obligate either of the Parties hereto, to any person or entity other than each other.

21.12  <u>No Partnership</u>.  Nothing contained in this Agreement shall be construed to create a partnership or joint venture between the Parties or their successors in interest.

21.13  <u>JURY WAIVER</u>.  **BUYER AND SELLER EACH WAIVES THE RIGHT TO A JURY IN ANY LITIGATION IN CONNECTION WITH THIS AGREEMENT, OR THE PROPERTY, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  BUYER AND SELLER EACH ACKNOWLEDGE THAT THIS WAIVER HAS BEEN FREELY GIVEN AFTER CONSULTATION BY IT WITH COMPETENT COUNSEL.**

21.14  **Confidentiality**.  Buyer and Seller agree to keep in strict confidence all terms and conditions of the transactions that are the subject of this Agreement ("**Transactions**") and the contents of the Due Diligence Items delivered by Seller to Buyer and all information obtained by Buyer through its inspections of the Property (including, without limitation, financial matters such as but not limited to costs, expenses and income of the Property and/or other matters obtained by Buyer pertaining to Seller) ("**Transaction Materials**"); provided, however, that Buyer and Seller shall be permitted to disclose the terms and conditions of the Transactions and the contents of the Transaction Materials to their respective members, managers, employees, contractors, agents, attorneys, accountants, consultants, permitted assignees, brokers, potential investors, investors, potential lenders and lenders in the event that such disclosure is reasonably necessary in connection with the consummation of the Transactions, provided that Buyer or Seller (as applicable) advises such members, managers, employees, contractors, agents, attorneys, accountants, consultants, permitted assignees, brokers, potential investors, investors, potential lenders and lenders that such terms and conditions and Transaction Materials are confidential and shall not be disclosed to any other person or entity; and provided further, however, that Seller and Buyer may disclose the existence of this Agreement (but not the terms or conditions hereof or thereof) to applicable governmental agencies or entities in the event that, with respect to Buyer, such disclosure is reasonably necessary in connection with the performance of Buyer's due diligence investigations with respect to the Property as permitted under the Agreement, and in the event that, with respect to Seller and Buyer, such disclosure is reasonably necessary in connection with consummation of the Transactions; and provided further, however, that Seller and Buyer may disclose the terms and conditions of this Agreement and the contents of the Transaction Materials as may be required in response to a subpoena or other court process or as otherwise required by law; provided, however, that the Party intending to disclose any such information shall first provide the other Party with prior written notice of such disclosure and shall afford such Party the opportunity to oppose or limit such disclosure to the extent such disclosure is not required by law or by a final non-appealable judgment.  Buyer's and Seller's confidentiality obligations under this Agreement shall survive the termination of this Agreement in the event that the closing of the Transactions does not occur in accordance with this Agreement.

22.  <u>Bankruptcy Court Approval</u>. The obligation of Seller and Buyer to consummate the transactions contemplated by this Agreement shall be subject to the issuance and entry by the Bankruptcy Court of one or more orders, in form and substance to the reasonable satisfaction of Buyer, providing for, inter alia, (a) approval of the transactions contemplated by this Agreement, including, but not limited to, the sale of the Property to the

Buyer, with such sale to be free and clear of any and all liens, claims and encumbrances, subject only to the Permitted Exceptions, in accordance with sections 363(b) and (f) of the Bankruptcy Code (collectively, **"Bankruptcy Court Approval"**).  In the event that Bankruptcy Court Approval cannot be obtained within ninety (90) days from the date hereof, at Buyer's election (to be exercised in a writing delivered by Buyer to Seller) this Agreement shall be deemed terminated, and Buyer's obligation to purchase, and Seller's obligation to sell, the Property shall terminate, and neither Party shall have any further obligation to the other except as otherwise provided in this Agreement except that the Earnest Money shall be refunded to Buyer.

        23.    <u>Assignment of Mortgage</u>.  Seller shall use reasonable commercial effects to cause the holder(s) of any mortgage on the Property to assign such mortgage to Purchaser's lender without cost to Purchaser.  This shall not constitute a mortgage contingency clause.

        24.    <u>Action Letter</u>.  Seller shall cooperate with Purchaser through the Closing Date, and at Purchaser's sole cost and expense, in seeking to subdivide the Property into two (2) separate tax lots, including without limitation, the obtaining of a No Action Letter from the New York State Attorney General.

        IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement as of the Effective Date.

**SELLER:**

**MADISON HOTEL, LLC**
**By: Madison Hotel Liquidation Trust**

By:_____
Name: Grant Lyon
Its:    Liquidating Trustee


**ASSA PROPERTIES INC.**

By:_____
Name: Solly Assa
Its:

Cl. Docs:/Assa, Solly:/Purchase and Sale Agreement (3)

Buyer, with such sale to be free and clear of any and all liens, claims and encumbrances, subject only to the Permitted Exceptions, in accordance with sections 363(b) and (f) of the Bankruptcy Code (collectively, "**Bankruptcy Court Approval**"). In the event that Bankruptcy Court Approval cannot be obtained within ninety (90) days from the date hereof, at Buyer's election (to be exercised in a writing delivered by Buyer to Seller) this Agreement shall be deemed terminated, and Buyer's obligation to purchase, and Seller's obligation to sell, the Property shall terminate, and neither Party shall have any further obligation to the other except as otherwise provided in this Agreement except that the Earnest Money shall be refunded to Buyer.

      23.    <u>Assignment of Mortgage</u>. Seller shall use reasonable commercial effects to cause the holder(s) of any mortgage on the Property to assign such mortgage to Purchaser's lender without cost to Purchaser. This shall not constitute a mortgage contingency clause.

      24.    <u>Action Letter</u>. Seller shall cooperate with Purchaser through the Closing Date, and at Purchaser's sole cost and expense, in seeking to subdivide the Property into two (2) separate tax lots, including without limitation, the obtaining of a No Action Letter from the New York State Attorney General.

      IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement as of the Effective Date.

**SELLER**:

**MADISON HOTEL, LLC**
**By: Madison Hotel Liquidation Trust**

By:_____
Name: Grant Lyon
Its:    Liquidating Trustee

**ASSA PROPERTIES INC.**

By: _____
Name: ~~Solly Assa~~ *Richard J. Migliaccio*
Its: *General Counsel and Authorized Person*

## EXHIBIT "A"

## DESCRIPTION OF LAND

## EXHIBIT "B"

## DEED

RECORDING REQUESTED BY AND

WHEN RECORDED MAIL TO:

[_____]
_____
_____

_____
(Space Above Line for Recorder's Use Only)

## EXHIBIT "A"

## TO DEED AND ASSIGNMENT AND ASSUMPTION

## DESCRIPTION OF LAND

The Land is located in the State of New York, County of New York, and is described as follows:

## EXHIBIT "D"

## BILL OF SALE

THIS BILL OF SALE ("**Bill of Sale**") is made as of _____, 2013, (**Effective Date**"), by **MADISION HOTEL, LLC** ("**Seller**"), and **ASSA PROPERTIES INC.** ("**Buyer**") with reference to the following facts:

WHEREAS, Seller and Buyer entered into that certain Purchase and Sale Agreement, dated as of July 1, 2013, between Seller and Buyer (the "**Purchase Agreement**"), respecting the sale of certain Property, which includes the Personal Property.  All capitalized terms used herein, unless indicated to the contrary, have the meanings ascribed to them in the Purchase Agreement.

WHEREAS, pursuant to the Purchase Agreement, Seller has agreed to transfer to Buyer all of its rights, title and interest in and to the Personal Property, which is defined in the Purchase Agreement as the tangible personal property owned by Seller that, as of the Effective Date of the Purchase Agreement, was placed or installed on or about the Land and/or Improvements, used in connection with the use, ownership, operation, management, maintenance and/or repair of the Land and/or Improvements and described on **Schedule 1** attached hereto.

NOW, THEREFORE, for good and valuable consideration, Seller hereby grants, sells, transfers, assigns, conveys and delivers to Buyer all of the Personal Property.

SUBJECT TO SECTION 12 OF THE PURCHASE AGREEMENT, THE PERSONAL PROPERTY IS CONVEYED AS IS, WHERE IS WITHOUT WARRANTY OR REPRESENTATION, AND ALL WARRANTIES OF QUALITY, FITNESS AND MERCHANTABILITY ARE HEREBY EXCLUDED.

Seller shall, upon request by Buyer, execute and deliver to Buyer such additional documents as Buyer may reasonably request in order to assign and transfer fully to and vest in Buyer all rights, title or interest in and to the Personal Property, or to enable Buyer to realize upon or otherwise enjoy such rights and property.

This Bill of Sale shall be binding upon and inure to the benefit of the successors, assigns, personal representatives, heirs and legatees of Buyer and Seller.

[Signature Page Follows]

1

IN WITNESS WHEREOF, Seller has executed this Bill of Sale as of the Effective Date of this Bill of Sale.

**SELLER**:

**MADISON HOTEL, LLC**
**By:  Madison Hotel Liquidation Trust**


By:_____
Name: Grant Lyon
Its:      Liquidating Trustee